923 A.2d 952

**Mario AYALA**

v.

**STATE of Maryland.**

**No. 943, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

May 23, 2007.

Piedad Gomez (Nancy S. Forster, Public Defender, on the brief), Baltimore, for appellant

Diane E. Keller (J. Joseph Curran, Atty. Gen., on the brief), Baltimore, for appellee.

DAVIS, DEBORAH S. EYLER and JAMES A. KENNEY, III * (Retired, Specially Assigned), JJ.

---

* Kenney, J. participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

DAVIS, J.

A jury in the Circuit Court for Prince George's County convicted Mario Ayala (Ayala), the appellant, of first-degree murder. The court sentenced Ayala to life in prison and he filed this appeal.

## ISSUES

Ayala presents the following arguments for this Court's review:

I. The trial court erred in allowing the State to present irrelevant, incompetent, and inflammatory gang evidence.

II. The trial court erred in denying the motion to suppress Mr. Ayala' s statements to the police.

III. The trial court erred in refusing to instruct the jury to consider Mr. Ayala's *mens rea* separately from that of the other participants in the crime.

IV. The trial court erred in admitting prejudicial photographs.

Finding no merit in any of these arguments, we shall affirm the judgment of the trial court.

## FACTUAL SUMMATION

Ayala's conviction stems from the beating death of Ashley Antonio Urias, a 38–year old father of three who resided in Silver Spring, Maryland. At trial, the State established that Ayala and two other young men—Ayala's cousin, Alexis Ayala, and their friend, Everec Alvarez Chacon—befriended Urias on May 24, 2004, then drove him to a cemetery in Chacon's pick-up truck for what was to be a night of drinking. Two baseball bats and a golf club were stowed in the truck. At the cemetery, Chacon and Alexis Ayala beat Urias with the baseball bats. Mario Ayala struck Urias several times with the golf club.

The State presented evidence that Ayala and his two accomplices were members of "MS–13," a violent Latino gang. The State theorized that the three men killed Urias because they

believed—possibly mistakenly—that he was a member of a rival gang known as the "18th Street gang." [1]

Ayala did not dispute that he participated in the killing. The defense argued that one of Ayala's pre-trial statements indicated that Urias had taken one of the bats from Chacon's pick-up truck and was the aggressor in the fight, and that the accomplices wrestled the bat from him and retrieved the other bat and the golf club from the truck. The defense contended that the golf club had then been dropped on the ground, and that Ayala picked it up and used it in self defense or defense of others. The defense also contended that Ayala was intimidated by the other two members of the gang and believed he would face retaliation if he did not assist them in the beating. Additional facts will be provided, *infra,* as warranted.

## DISCUSSION

### I

### Admissibility of Gang Evidence

#### —*Trial Court's Rulings*—

Prior to trial, the defense moved *in limine* to bar any evidence regarding the MS–13 gang and Ayala's membership therein. Defense counsel argued, in essence, that evidence regarding the gang would amount to evidence of bad character or prior bad acts, and would serve "no real purpose other than to prejudice Mr. Ayala." Counsel reasoned:

> Because [the] probative value is questionable at best and the prejudicial impact would be high and extremely unfair, the evidence, anything to do with MS–13 whether it's expert testimony, pictures of tattoos, clothing, spoken references

---

1. During *voir dire,* the court specifically asked, "Is there any member of the panel who is a member of an organization or group which might be classified as a gang?" The court also asked, "Has any member of the panel ever been a victim or had a relative or friend be a victim of gang-related violence?" Those potential jurors who answered in the affirmative were further asked whether their experiences would affect their ability fairly and impartially to hear the evidence in the case.

by witnesses, anything that has to do with gang member-
ship or the term MS–13, specifically should be excluded
from being presented at trial.

The trial court disagreed and stated:

I'm going to deny the motion *in limine[.]* [I]f you weigh
the imbalance of probative value versus the prejudice[,] . . .
I think it has significant probative value. I appreciate th[at]
motive is not an element of the crime[,] . . . [but] certainly
motivation is a significant part of the State's case. And to
bar that evidence would be unfair. Accordingly, having said
that[,] the motion *in limine* [is denied]. . . .

At trial, the court granted defense counsel's continuing
objection to evidence regarding gang membership but reiter-
ated:

I think that the gang evidence has probative value beyond
the prejudice because it goes to the theory of the State's
case as to motive. I appreciate that motive is not an
element of the crime, but certainly the absence or presence
of motive is a factor for the jury to consider. I think the
State is entitled to prove their case. . . .

*—Presentation of Gang Evidence—*

Thereafter, over defense counsel's objection, the trial court
permitted the State to introduce evidence as to the contents of
two pre-trial statements made by Ayala. Detective Felipe
Ordono, a member of the Prince George's County Police
Department's Regional Gang Unit, testified that, in Ayala's
first statement, he admitted that he was a member of the MS–
13 gang and indicated that Alexis Ayala and Chacon were
members of the gang as well. Detective Gregory McDonald
of the Prince George's County Police Department, who was
the lead investigator in the Urias case, testified that, in the
second statement, Ayala revealed that Urias had told the
three men that he was a member of the 18th Street gang. A
video recording was made of the second statement, and por-
tions of the video recording were played and interpreted for

the jury.[2] In one portion, Ayala stated that he had been beaten by a member of the 18th Street gang and still had a cut on his forehead from the beating.

Also over defense counsel's objection, the trial court accepted Detective Michael Porter of the Fairfax County, Virginia Police Department's Gang Investigation Unit "as an expert in the area on MS–13." Detective Porter related the history and customs of the MS–13 gang.

The detective stated that "MS" stands for "Mara–Salvatrucha." He explained, "Mara, I understand, refers to gang or gangs. Salvatrucha I have been told means anything from [ (1) ] here we come, [ (2) ] a river, [ (3) ] a slippery trout, and so forth." The detective added that the gang originated in Los Angeles, where Latino gangs "fall under the Mexican Mafia prison gang when they go to the penitentiaries." He explained that the number 13 was added to the name of the gang because "the 13th letter of the Alphabet [is] M standing for Mexican Mafia."

Detective Porter testified that MS–13 has many subgroups, or "cliques," throughout the United States and other countries, including "SLSW"—or "Sailors Loco Salvatrucha Western"—which is active in the "Maryland, D.C., and Virginia" areas. According to the detective, "MS–13 is the header gang and below that are the cliques. In order to get into MS–13, you have to become part of one of the cliques." He explained that young men "have to be jumped into" a clique, meaning they receive "a 13–second beating from either three to five members of the gang, the clique that you want to get … into." The purpose of this initiation process is to ensure that the prospective member is "willing to take a beating for them and from the[m]," which purportedly establishes that the member will be "willing to put in the work when the time comes."

---

**2.** A transcription of this second statement was made part of the record on appeal, but apparently was not offered into evidence in the trial court.

Detective Porter explained that "the work" that members of MS–13 cliques are expected to "put in" consists of "getting at [the gang's enemies]." The detective stated, "18th Street is the chief rival of MS–13. MS–13 members are expected to, in their words, get at members of 18th Street, get the members of 18th Street. No questions. You see an 18th Street member, you get that 18th Street member." Detective Porter observed that the MS–13 gang is known for employing a variety of weapons in performing this work, including "[b]aseball bats, machetes, guns, any weapon they can use." He added, "If I am involved with a case where MS–13 is believed to have done something to an 18th Street member, that would automatically give me a motive because the rivalry between 18th Street and MS–13 is not only national but international." According to Detective Porter, "Reputation and respect is everything. The more you are willing to do for the gang, the more respect you have within the gang." In addition, "MS–13 disciplines their own members. For you not to backup one of your homeboys when he did something, MS–13 will punish you."

The detective observed that members of the MS–13 cliques wear, primarily, the colors blue and white, and often have the number "13" somewhere on their clothing. They may have tattoos that signify their affiliation with the gang, although "there are members that have no tattoos." Often, "the people that seem to have more tattoos seem to be the people that have been in longer." In addition, having tattoos on the neck or above may signify the commission of a crime or crimes of violence. Gang members will not wear the color red as a main color of their clothing; nor will they display the numbers "8," "18," or "14" on their clothing or person since those colors and numbers signify membership in the 18th Street gang. MS–13 members have developed a series of hand signals with which they can secretly communicate with one another.

Photographs seized from Ayala's home were admitted into evidence through Detective McDonald, who executed the search warrant on the home. The photographs depicted blue and white clothing with the number 13 on it, various persons,

including Ayala making hand signals and gang-related tattoos on various persons, including Ayala. Subsequently, the prosecutor showed the photographs to Detective Porter while he was on the stand. In response to the prosecutor's questioning, Detective Porter expressed his opinion that Ayala was a member of MS–13. The detective acknowledged that he had reviewed the interview during which Ayala told police that the victim stated he was a member of the 18th Street gang. The prosecutor's subsequent questioning of the detective proceeded as follows:

Q ... Do you have an opinion to a reasonable degree of professional certainty as to what effect his membership in MS–13 would have on his interaction with a person whom he believed to be a member of the 18th Street gang, particularly if the Defendant was in the company of two other persons who were members of MS–13?

A As a member of MS–13 against an 18th Street member, he could not just sit by and do nothing. For him not to become involved in itself would be a violation where he didn't backup his homeboys, where he didn't step up and represent MS–13. And he would have been disciplined for it in what MS–13 refers to as court. He would have been disciplined, beaten....

The State elicited additional testimony regarding the MS–13 gang from three other witnesses. Jorge Moran, a resident of Port Washington, New York, testified that he knew Everec Alvarez Chacon when they both lived in El Salvador, before each moved to the United States. In late May of 2004, Chacon called Moran and told him that he was in New York. Chacon, Alexis Ayala and appellant, Mario Ayala, then went to Moran's house, and the three stayed with Moran and his family for about a week. During that time, Moran heard the men talking about "Mara Salvatrucha" and "making the hand signs." Ultimately, Moran became disturbed by arguments between Chacon and Alexis Ayala and told all three men to leave.

Detective Thomas McCarthy of the Port Washington Police Department testified that he was assigned to the department's Gang Investigation Unit. He told the court that the MS–13 gang has a clique in Port Washington and that the members congregate in a local park known as Manorhaven Park. Detective McCarthy reported that, in late June of 2004, he was informed that there were outstanding warrants from Prince George's County for the arrests of Ayala and Chacon.[3] The detective participated in the arrests of the two men on June 23, 2004, in Manorhaven Park.

Detective McDonald, through whom the photos seized from Ayala's home were introduced, also testified that the various subjects of the photos were indicative of gang activity. Detective McDonald stated that the photos indicated that Ayala was a member of the SLSW clique of MS–13.

### —Arguments on Appeal—

Ayala now argues that all of the evidence regarding gang activity and membership was "irrelevant," "incompetent," and "extremely prejudicial," and that the trial court committed reversible error by admitting it. His argument has two prongs.

First, Ayala asserts that the only evidence linking Urias to the 18th Street gang was Ayala's own pre-trial statement to the police to the effect that Urias said he was a member of that gang. Ayala points out that Urias's wife testified that she "never saw him in any gang" and that he had no gang-related tattoos of which she was aware. From this, Ayala asserts that "there was no evidence that this was a 'gang killing,'" and the gang evidence, therefore, should not have been admitted.

Ayala next argues that, even if the evidence suggested that the killing was gang-related, Detective Porter's expert testimony "impermissibly invaded the province of the jury by

---

**3.** At that point, Alexis Ayala had returned to Maryland and had been arrested there.

expounding upon the ultimate issue of guilt" and on Ayala's state of mind. Ayala adds that unduly prejudicial evidence regarding gang membership was also elicited from Jorge Moran, Detective McDonald, and Detective McCarthy.

*—Resolution of Arguments—*

### A. Propriety of Admission of Gang Evidence

There can be little doubt that evidence that a defendant is a member of an organization known for violent acts may be evidence of bad character or prior bad acts. *See generally Klauenberg v. State*, 355 Md. 528, 547–49, 735 A.2d 1061 (1999) (where the Court of Appeals discussed what constitutes a bad act and commented in *dicta* that in some cases decided by courts of other jurisdictions "membership in a gang was considered a bad act"). Under Md. Rule 5–404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

As the Court of Appeals has explained:

> One of the purposes for which other crimes evidence may be admitted under Rule 5–404(b) is to prove motive. Motive is the catalyst that provides the reason for a person to engage in criminal activity.... "Like intent, motive is a mental state, the proof of which necessarily requires inferences to be drawn from conduct or extrinsic acts."
>
> * * *
>
> To be admissible as evidence of motive, ... the prior conduct must be " 'committed within such time, or show such relationship to the main charge, as to make connection obvious,' ... that is to say they are 'so linked in point of time or circumstances as to show intent or motive.' "

*Snyder v. State*, 361 Md. 580, 604–05, 762 A.2d 125 (2000) (citations omitted). Once a trial court has determined that

evidence of a prior bad act has special relevancy to prove motive, and that the defendant's involvement in the act has been established by clear and convincing evidence, the court has discretion to admit the evidence. *See Streater v. State,* 352 Md. 800, 807, 724 A.2d 111 (1999).

In *Dawson v. Delaware,* 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992), the Supreme Court determined that a murder defendant's right to freedom of association, as protected by the First and Fourteenth Amendments to the Constitution of the United States, was violated by the admission, at his sentencing hearing, of evidence that he was a member of a white, racist, prison gang. The Court pointed out that the State did not establish that the gang committed any unlawful or violent acts or endorsed the commission of such acts. It determined that, under the circumstances, the evidence simply was not relevant to any issue being decided at the sentencing hearing. *See id.* at 166, 112 S.Ct. 1093. The Court commented, however, that "[a] defendant's membership in an organization that endorses the killing of any identifiable group ... might be relevant" for certain legitimate purposes, such as establishing aggravating circumstances or showing that the defendant "represents a future danger to society." *Id.* at 166, 112 S.Ct. 1093.

As Ayala acknowledges, courts in other jurisdictions have consistently held that evidence of a defendant's membership in a gang is admissible in the defendant's trial for murder if the evidence is relevant to establish the defendant's motive. *See generally* John E. Theuman, *Admissibility of Evidence of Accused's Membership in Gang,* 39 A.L.R. 4th (1985). Ayala argues, in essence, that such gang evidence should not be admitted unless there is independent evidence linking the defendant to the gang and the crime and, thus, suggesting a gang-related motive. Ayala cites a number of cases for this proposition, none of which purports to impose such a requirement.[4] We do not agree with Ayala that the State should be

---

4. *See, e.g., United States v. Santiago,* 46 F.3d 885, 889 (9th Cir.1995) (evidence regarding nature of Mexican Mafia gang admissible to estab-

prevented from presenting crucial evidence regarding motive merely because it has not had the good fortune to find a witness who is willing to step forward and suggest a connection between the gang and the crime.

Two of the cases on which Ayala mistakenly relies are factually on point and persuade us that the trial court properly admitted the testimony in question. In *State v. Nieto*, 129 N.M. 688, 12 P.3d 442 (2000), the defendant was convicted of four counts of murder and related offenses in the deaths of an acquaintance, the acquaintance's girlfriend, and the girlfriend's two young sons. At trial, the State theorized that the defendant committed the offenses with two other men. Like Ayala, the defendant contended that he was not aware in

---

lish that inmate defendant's motive for killing another inmate was gang's requirement that potential members commit murder in order to be admitted to gang); *Commonwealth v. Swafford*, 441 Mass. 329, 805 N.E.2d 931, 934–35 (2004) (evidence of defendant's gang membership was relevant to show that defendant's motive for shooting victim was retribution for victim's beating of fellow gang member); *State v. Fierro*, 124 Ariz. 182, 603 P.2d 74, 78–79 (1979) (expert testimony regarding Mexican Mafia gang was relevant to establish motive of murder defendant where another witness testified that defendant had been ordered by gang leader to kill victim); *Jordan v. State*, 629 So.2d 738, 741–42 (Ala.Crim.App.1993) (evidence that defendant was member of gang was admissible to show motive where another gang member testified that defendant knew committing murder would help him "move up" in rank, and a week prior to killing defendant told witness he wanted to "move up"); *People v. Mendez*, 221 Ill.App.3d 868, 164 Ill.Dec. 321, 582 N.E.2d 1265, 1270 (1991) (explaining, in *dicta*, that expert testimony regarding gangs was relevant to establish defendant's motive in drive-by shooting case where other evidence indicated shooting was in retaliation for earlier drive-by shooting committed by rival gang). *Compare State v. DeShay*, 669 N.W.2d 878, 885–86 (Minn.2003) (extensive expert testimony regarding organization and criminal ventures of gang was not relevant or necessary to uncomplicated and straightforward prosecution of defendant for conspiracy to distribute drugs; testimony was for the most part duplicative of testimony of lay witnesses, however, and its admission was therefore harmless); *Ex Parte Thomas*, 625 So.2d 1156 (Ala.1993) *(per curiam)* (where State agreed with defense that drive-by shooting was not gang related, testimony that defendant was member of gang known for drive-by shootings and other acts of violence was irrelevant and unduly prejudicial, and court committed reversible error by admitting such testimony over objection), *reversing and discussing Thomas v. State*, 625 So.2d 1149 (Ala.Crim. App.1992).

advance that the crimes would be committed, and he participated only because he feared retaliation if he failed to do so. *See id.* at 445.

In *Nieto,* the State contended that the defendant was a member of the 18th Street gang, and "theorized that Defendant's actions were deliberate and motivated by his desire to accommodate" the other members of the gang.[5] *Id.* at 446. Over defense counsel's objection, the prosecution called to the stand a police detective, who was accepted by the court as an expert witness on gangs.

> [The detective] first defined the word "gang" and listed the criteria used by his unit to identify gangs. After identifying the 18th Street Gang as the largest gang in Albuquerque, [the detective] testified that Defendant was one of its members. [The detective] described the hierarchical structure of gangs, including the violent means of gang initiation and the procedures by which already initiated members rise in the ranks.

*Id.*

On appeal, the *Nieto* defendant argued that the trial court erred by permitting "expert testimony regarding gang subculture [that] contained evidence of association and bad acts." *Id.* at 449. Like Ayala, the defendant posited that the testimony "constituted improper character evidence" and "was unfairly prejudicial." *Id.* In rejecting the argument, the Supreme Court of New Mexico explained:

> To be sure, evidence of gang affiliation could be used improperly as a backdoor means of introducing character evidence by associating the defendant with the gang and describing the gang's bad acts .... however, evidence of gang affiliation that might otherwise be inadmissible character evidence may be admissible to show other important elements of the crime. [The expert witness's] testimony,

---

5. The *Nieto* court commented that the State theorized that the gang had ordered a hit on the male victim. There is no indication in the opinion, however, that the State presented specific evidence as to such a hit order. *See Nieto,* 12 P.3d at 446.

both as to Defendant's affiliation with the 18th Street Gang and the specific rituals and procedures of that gang, was admissible to show Defendant's alleged motive (to rise up in the ranks of the gang by performing a hit on its behalf) and intent to murder the victims.

Defendant also urges that evidence of Defendant's association with 18th Street Gang, and the bad acts of that particular gang, was unfairly prejudicial. Evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or if it confuses the issues or misleads the jury. Here, as evidence of Defendant's motive and intent, the testimony had considerable probative value.... In light of the probative value of this testimony, we hold that the trial court did not abuse its discretion....

*Id.* at 450 (citations omitted).

Similarly, in *People v. Davis*, 335 Ill.App.3d 1, 268 Ill.Dec. 829, 779 N.E.2d 443 (2002), the defendant was convicted of murder, attempted murder, and a related firearm charge in connection with an attack on a group of people who were sitting on a porch. The prosecution theorized that defendant and accomplices, who were members of the same gang, opened fire on the victims, who were members of a different gang. The trial court permitted a witness who observed the shootings to testify that the perpetrators were members of the "Black P Stones" gang, and permitted a police detective to testify regarding gang structure and gang rivalries. *Id.* at 456. It also admitted evidence that the defendant acknowledged prior to trial that he was a member of the gang, that the gang was at war with the "Undertaker Vice Lords" gang, and that he and his accomplices went to the scene of the crime to look for rival gang members. *See id.*

In challenging his convictions on appeal, the defendant argued that the evidence regarding gangs was "(1) irrelevant because '[t]here was never any testimony that [he] or [the murder victim] were gang members or that their connection to one another was gang related,' and (2) 'highly prejudicial,' introduced 'solely to inflame the jury and appeal to their

general bias against gang activity and the status of gang members in our society.'" *Id.* at 455. The Appellate Court of Illinois disagreed and explained:

Gang evidence is relevant when, among other things, it provides motive for an otherwise inexplicable act or corroborates a defendant's confession. In particular, any evidence that tends to show the defendant had a motive for killing the victim is relevant because it enhances the probability that the defendant did kill the victim.

Here, [the defendant] admitted a gang motive for the shooting. He said he had been a member of the Black P–Stones gang. In his confession, [the defendant] said his gang was "at war" with the Undertaker Vice Lords. [The defendant] and his co-offenders went to 512 North Laramie on the night of the shooting to shoot at rival gang members.

[The police detective's and the lay witness's] testimony corroborated [the defendant's] statement regarding the gang war. Their testimony explained the gang war was over the right to sell drugs in the area where the shooting occurred. The gang testimony also showed that shootings are a common product of gang "war[s]."

True, no evidence was presented showing [the murder victim] was in a gang, but that does not undermine the relevance of the gang evidence. [The defendant] said *he thought* his co-offenders were going to shoot at members of a rival gang.

There may be strong prejudice against street gangs in the Chicago area. This prejudice attaches to evidence of [a] defendant's gang membership, but that alone does not render gang evidence inadmissible. Gang evidence is admissible despite the prejudice that attaches if it is relevant and particularly if it is crucial in establishing motive.

*Id.* at 456 (citations omitted) (emphasis in original).

█ In this case, the State presented evidence, *via* Ayala's pre-trial statement, that Ayala and his accomplices were members of MS–13, and that Urias told the men that he was a member of the 18th Street gang. As in *Davis,* the fact that

Urias may not truly have been a member of the 18th Street gang did not "undermine the relevance of the gang evidence," in that Ayala and his accomplices apparently believed that he was. *See id.* at 456. In his second pre-trial statement, moreover, Ayala revealed that he had once been attacked by a member of the 18th Street gang, and that he still had a scar on his forehead from the beating.

As in *Davis,* the gang testimony presented by the State corroborated the defendant's—in this case Ayala's—pre-trial statement that the perpetrators and the victim were members of rival gangs. Further, the evidence served to explain the "otherwise inexplicable," by providing a motive for a brutal and seemingly senseless killing. *Id.* at 456. Detective Porter's detailed testimony regarding the history and structure of the MS–13 gang was highly probative in that it explained the gang's code of conduct and revealed the gang's long and bitter rivalry with the 18th Street gang. The detective's testimony made clear that the relationship between the two gangs was regularly punctuated by acts of extreme violence, and that such acts might be based on amorphous, perceived slights that occurred between other gang members in the distant past rather than on any concrete, identifiable disputes between the immediate parties to the acts. In addition to showing that Ayala personally might have desired revenge for an earlier beating, the evidence indicated that Ayala, like the defendant in *Nieto,* may have participated in the murder in order to secure his place in the gang. *See Nieto,* 12 P.3d at 446.

While we establish no bright-line rule as to the admissibility of gang evidence in Maryland, we conclude that the trial court in this case properly exercised its discretion when it admitted the evidence in question. As the trial court determined, the evidence was highly probative in establishing motive and was not unduly prejudicial under the circumstances.

## B. Propriety of Expert Testimony

We are not persuaded by Ayala's contention that Detective Porter expressed an opinion on Ayala's "mental state" and, thus, invaded the province of the jury. Preliminarily, the argument is not properly before this Court. In objecting in

the trial court to the evidence regarding gangs and Ayala's involvement in the MS–13 gang, defense counsel specifically argued that the prejudicial effect of the evidence outweighed its probative value; he did not raise the argument now urged.[6] "It is well-settled that when specific grounds are given at trial for an objection, the party objecting will be held to those grounds and ordinarily waives any grounds not specified that are later raised on appeal." *Klauenberg*, 355 Md. at 541, 735 A.2d 1061. *See generally* Md. Rule 8–131(a).

In any event, the argument is without merit. Maryland Rule 5–704, titled "Opinion on ultimate issue," provides in pertinent part:

(a) In general. Except as provided in section (b) of this Rule, testimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact.

(b) Opinion on mental state or condition. An expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may not state an opinion or inference as to whether the defendant had a mental state or condition constituting an element of the crime charged. That issue is for the trier of fact alone.

Detective Porter expressed his opinion, based on the photos and articles of clothing seized from Ayala's home, that Ayala was a member of MS–13. As Ayala points out, the prosecutor then asked the detective "what effect [ Ayala' s] membership in MS–13 would have on his interaction with a person whom he believed to be a member of the 18th Street gang, particularly if [Ayala] was in the company of two other persons who

---

6. Contrary to Ayala's assertions, we cannot agree that the argument was preserved by counsel's assertions at trial that gang evidence would introduce a stereotype and would be unduly prejudicial. Nor are we persuaded that the argument was preserved by counsel's vague assertion—which was made in a written "Motion *in Limine*" that was filed prior to trial and which was not reiterated at trial—that gang evidence "would amount to admitting speculation and unsubstantiated conclusions as to the inclination of the Defendants to participate in the murder of the decedent."

were members of MS–13?" Detective Porter explained that, as a member of MS–13, Ayala would be expected to "step up and represent MS–13" and would be "disciplined, beaten" if he failed to do so. Contrary to Ayala's suggestion, the detective was not asked to—and did not—comment upon Ayala' s state of mind at the time of Ayala's murder. Rather, the detective was asked to—and did—explain what action the gang's code of conduct would have required of Ayala in any confrontation with a member of the rival gang. Detective Porter's testimony did not touch upon whether, in the instant case, Ayala harbored the requisite intent to kill Urias. *See generally* Md.Code (2002), Criminal Law, § 2–201 (2002 Repl.Vol.2006 Supp.); *Bryant v. State*, 393 Md. 196, 215, 900 A.2d 227 (2006) (discussing intent to kill element of first-degree murder).

"A trial judge has wide discretion in determining the admissibility of expert testimony. Such decisions 'rarely constitute[ ] a basis for reversal.'" *Lucas v. State*, 116 Md.App. 559, 578, 698 A.2d 1145 (1997). " 'Abuse of discretion may be found where the probative value of admitted testimony is outweighed by prejudice,'" and prejudice that would " 'outweigh probative value involves more than mere damage to the opponent's case.'" *Id.* As we have explained, the probative value of Detective Porter's expert testimony was significant. In addition, the factual basis for the detective's opinion was strong. *See, e.g., Sippio v. State*, 350 Md. 633, 654–56, 714 A.2d 864 (1998) (facts supported medical examiner's expert opinion that victim was murdered; therefore, opinion was properly admitted into evidence). *Compare Cook v. State*, 84 Md.App. 122, 142, 578 A.2d 283 (1990) (trial court erred in permitting expert to express opinion as to defendant's role in drug organization where facts did not provide basis for opinion). The trial court properly exercised its discretion in admitting the expert testimony.

## II

### Denial of Motion to Suppress Statements

Ayala made two pre-trial statements to police. The first statement was made on June 23, 2004, to Detective McDonald

and Detective Ordono, both of whom traveled to Port Washington, New York to meet with Ayala and Chacon the day they were arrested there. The second statement was made on July 29, 2004, to Detective McDonald and Detective Robert Turner, also of the Prince George's County Police Department, immediately upon Ayala's arrival at the Department's Criminal Investigation Division on the day of his extradition. Ayala moved to suppress both statements; defense counsel argued that the statements were involuntary under the totality of the circumstances. Counsel further argued, as to each statement, that the State failed to establish that it presented Ayala to a court commissioner promptly, if at all. Ayala reiterates those arguments on appeal to this Court.

As the Court of Appeals has summarized:

> On appellate review, this Court will look exclusively to the record of the suppression hearing when reviewing the denial of a motion to suppress evidence. Furthermore, we will accept the facts as found by the hearing judge unless those facts are clearly erroneous. In addition, the evidence is to be viewed in the light most favorable to the prevailing party. Nevertheless, we will undertake our own independent constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case.

*White v. State*, 374 Md. 232, 249, 821 A.2d 459 (2003) (citations omitted).

In reviewing the denial of a motion to suppress an extrajudicial statement, we are guided by the following principles:

> Only voluntary confessions are admissible as evidence under Maryland law. A confession is voluntary if it is "freely and voluntarily made" and the defendant making the confession "knew and understood what he [or she] was saying" at the time her or she said it. In order to be deemed voluntary, a confession must satisfy the mandates of the U.S. Constitution, the Maryland Constitution and Declaration of Rights, the United States Supreme Court's deci-

sion in *Miranda [v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ], and Maryland non-constitutional law."

The burden is on the State to prove that the confession was "freely and voluntarily made." ... [A] defendant's confession may not be used unless it is "shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary."

We have said that we must look at the totality of the circumstances in order to decide the voluntariness of a statement.... [W]e " 'look to all elements of the interrogation, including the manner in which it was conducted, the number of officers present, and the age, education, and experience of the defendant.' "

*Gorge v. State,* 386 Md. 600, 620–21, 873 A.2d 1171 (2005) (citations omitted).

One factor to consider in determining whether a statement was voluntary is whether the defendant was promptly presented to a court commissioner. *See Hiligh v. State,* 375 Md. 456, 472, 825 A.2d 1108 (2003); *Williams v. State,* 375 Md. 404, 416, 825 A.2d 1078 (2003). Maryland Rule 4–212(e) directs:

(e) Execution of warrant—Defendant not in custody. Unless the defendant is in custody, a warrant shall be executed by the arrest of the defendant. Unless the warrant and charging document are served at the time of the arrest, the officer shall inform the defendant of the nature of the offense charged and of the fact that a warrant has been issued. A copy of the warrant and charging document shall be served on the defendant promptly after the arrest. *The defendant shall be taken before a judicial officer of the District Court without unnecessary delay and in no event later than 24 hours after the arrest* or, if the warrant so specifies, before a judicial officer of the circuit court without unnecessary delay and in no event later than the next session of court after the date of arrest. The court shall process the defendant pursuant to Rule 4–216 and may

make provision for the appearance or waiver of counsel pursuant to Rule 4–215.

(Emphasis added.) At the same time, § 10–912 of the Courts and Judicial Proceedings Article provides:

§ 10–912. Failure to take defendant before judicial officer after arrest.

(a) *Confession not rendered inadmissible.*—A confession may not be excluded from evidence solely because the defendant was not taken before a judicial officer after arrest within any time period specified by Title 4 of the Maryland Rules.

(b) *Effect of failure to comply strictly with Title 4 of the Maryland Rules.*—Failure to strictly comply with the provisions of Title 4 of the Maryland Rules pertaining to taking a defendant before a judicial officer after arrest is only one factor, among others, to be considered by the court in deciding the voluntariness and admissibility of a confession.

Md.Code, § 10–912 Cts. & Jud. Proc. Art. (2006 Repl.Vol.).

*—First Statement—*

 At the hearing on the motion to suppress, Detective Ordono testified regarding Ayala's first statement. The detective indicated that he and Detective McDonald went to Port Washington, New York on June 23, 2004, immediately upon learning that Ayala and Chacon had been arrested. The detectives met with the two suspects at the police station there. The detectives first interviewed Chacon. About two hours later, they began interviewing Ayala.

The State presented no evidence at the hearing on the motion to suppress as to whether Ayala was ever taken before a judicial officer in New York. There is no dispute that Ayala was *not* taken before a judicial officer before he made his statement to Detectives Ordono and McDonald.[7]

---

7. Presumably, Ayala *was* taken before a New York court in accordance with the Interstate Agreement on Detainers before he was extradited to

■■■■■■■■■■

The detectives ascertained that appellant did not speak English. Detective Ordono testified that, because he spoke fluent Spanish, he communicated with Ayala and translated for Detective McDonald. Detective Ordono advised Ayala of his rights pursuant to *Miranda* using an advice of rights form printed in Spanish. Ayala indicated that he understood each of his rights and wrote his initials on the form to indicate that he understood.

Before proceeding with the interview, the detectives expressly asked Ayala if he wanted to make a statement, if he wished to have an attorney present, and if he was under the influence of any intoxicating substance. Ayala indicated that he did want to make a statement, he did not want an attorney at that time, and he was not under the influence of any substance. Detective Ordono stated that he was seated about eighteen inches from Ayala throughout the interview and did not detect the smell of alcohol. Ayala was not handcuffed during the interview and was permitted to use the restroom. Detective Ordono stated that no promises, threats, or offers of rewards of other benefits were made to Ayala.

At the start of the interview, Detective Ordono ascertained that Ayala was from El Salvador and had only a fourth grade education, which he had received in his native country. Ayala had lived in the United States for only a few years. Ayala told the detectives that he could not write in either language; he did not suggest that he could not read Spanish.[8] Detective Ordono transcribed by hand everything that was said during the interview, but mentally translated the discussion to English and wrote the transcription in English. The detective then read the transcript back to Ayala, verbally translating it

---

Maryland. *See* Md.Code (1999), §§ 8–401–8–417 of the Corr. Servs. Art. (setting forth the Interstate Agreement on Detainers).

**8.** Indeed, Detective McDonald later testified that Ayala was re-advised of his rights after he was extradited from New York to Prince George's County, and that at that time Ayala read aloud the rights printed on the Spanish-language advice of rights form.

back to Spanish. Ayala signed the statement based on the detective's verbal translation.[9]

Ayala then took the stand and testified that he did not remember making the statement on June 23, 2004 because he had drunk a 12–pack of beer and smoked PCP shortly before his arrest. Ayala acknowledged that he could read and write in Spanish "a little bit." He stated that he was twenty years old when he made the statement to Detectives Ordono and McDonald.

In arguing that Ayala's first statement was involuntary, defense counsel described Ayala as "a very vulnerable person" and pointed to his alleged intoxication, youthful age, lack of education; unfamiliarity with the English language; inability to read or write well in Spanish; and lack of experience with the criminal justice system. Counsel further argued that the fact that Ayala was not taken before a judicial officer in New York before he made the statement weighed heavily against voluntariness.

The court rejected defense counsel's argument, clearly finding Detective Ordono to have been the more credible witness. The court expressly accepted the detective's testimony that Ayala was not under the influence of alcohol or PCP at the time the statement was made. As to Ayala's low level of education, the court stated, "[T]o make a decision that no one in the fourth grade could confess, that would be a stretch to do right now." The court implicitly accepted Detective Ordono's testimony that he communicated clearly with Ayala in Spanish and accurately transcribed Ayala's statement into English.

Upon conducting our independent constitutional appraisal of the record of the suppression hearing, we perceive no error.

---

**9.** The statement was audiotaped, but the tape malfunctioned at the point when Detective Ordono was reading the interview back to Ayala and translating the writing to Spanish. Detective Ordono testified that the tape was recording properly while Ayala was making his statement and answering questions posed by the detectives. Thus, an audiotape of the statement would have been available to the defense had it been requested.

The evidence established that Ayala was a young man who had left his family and his native country of El Salvador several years earlier. Although he did not speak English and had little formal education, at the time of his arrest Ayala was living on his own with other young men and was working in New York. Ayala made his statement within several hours of his arrest and there was no indication that the statement was the result of threats, coercion, promises or inducements. Detective Ordono's testimony, as accepted by the trial court, established that Ayala made the statement while in a comfortable setting and clear state of mind.

The fact that Ayala was not taken before a judicial officer before he made his statement in New York is irrelevant to our analysis. As the Court of Appeals held in *Facon v. State,* 375 Md. 435, 449–50, 825 A.2d 1096 (2003):

> [T]he prompt presentment requirement under [Md. Rule 4–212(e) ] is not triggered where the defendant is held in custody outside of this State, absent evidence that officers of this State were working in conjunction with the other jurisdiction for purposes other than to secure extradition.

* * *

> There is a noteworthy, albeit narrow, exception to our holding that extraterritorial delays will not begin the running of time under Rule 4–212(e). As both Federal and other state courts have recognized, the police cannot avoid the requirement of the presentment rule through collusion with a foreign jurisdiction. Where it is demonstrated that officers from this State are working in collaboration with the other jurisdiction, interrogating a defendant prior to his transfer, the presentment requirement may apply to the officers' activities.

(Citations and footnote omitted).

There is no suggestion in this case that Detectives Ordono and McDonald collaborated with officers in New York to secure a confession from Ayala before taking him before a judicial officer. Indeed, the trial court specifically com-

mented, "I think the officer followed the spirit and intent and letter of the law in taking the statement." *See Daniels v. State,* 172 Md.App. 75, 125, 913 A.2d 617 (2006) (holding that, where there was no attempt to utilize jurisdictional barriers to circumvent Maryland Rule 4–212, the strictures against collaboration between law enforcement authorities in one jurisdiction in an attempt to insulate the authorities in a sister jurisdiction by keeping the arrestee beyond the reach of the laws of the sister jurisdiction, contemplated in *Facon,* are inapplicable.)

On this record, we are satisfied that the trial court properly denied the motion to suppress the statement made on June 23, 2004.

### —Second Statement—

 Testimony regarding Ayala's second statement was elicited at the hearing on the motion to suppress from Detective McDonald. Detective McDonald explained that representatives of the Sheriff's Office picked up Ayala in New York on July 29, 2004 and brought him to the Criminal Investigation Division (CID) of the Prince George's County Police Department. The prosecutor proffered to the court during subsequent argument that, in accordance with the usual procedure, Division of Correction personnel later picked up Ayala from CID and "took care of presentment" to a court commissioner.[10] Detective McDonald testified that, almost immediately upon Ayala's arrival at CID, he interviewed Ayala with Detective Turner, who spoke fluent Spanish. Ayala was advised of his *Miranda* rights using the same Spanish-language form used in New York. He again waived his rights.

Detective Turner verbally translated Detective McDonald's questions into Spanish for Ayala, then verbally translated Ayala's responses into English for Detective McDonald. The interview, which was video and audio recorded in its entirety, lasted approximately an hour and a half.

---

**10.** No testimony was offered on this point.

Detective McDonald testified that Ayala was not handcuffed during the interrogation. According to the detective, Ayala stated that he understood his rights and was willing to speak. Ayala was seated only an "armslength" from Detective McDonald and did not appear to be under the influence of any intoxicating substance.

Detective McDonald readily admitted that the interrogation was conducted before Ayala was taken before a commissioner and that the purpose of the interrogation was to gain more information about the Urias murder. The detective further acknowledged that efforts could have been—but were not—made to present Ayala to a judicial officer immediately upon his arrival at CID.

Ayala testified at the hearing that he had no recollection of making the statement, just as he had no recollection of making the earlier statement in New York. He stated that earlier that day in jail, before leaving New York for Prince George's, he had drunk "guaro," or home-made alcohol, and had smoked marijuana laced with crack cocaine. Ayala stated that when he arrived at CID he did not feel well and was hungry. He testified that he was not taken before a court commissioner before he made the statement and he did not believe he had ever been taken before a commissioner.

Defense counsel based her argument that the July 29, 2004, statement should be suppressed primarily on a perceived violation of Md. Rule 4-212(e). She asserted that, in light of the perceived violation, the statement was involuntary and asserted:

> The questioning took about an hour and a half. So he was questioned before ever being taken to a commissioner. I think the evidence has been unclear if and when he was ever taken to a commissioner, but it was uncontroverted that he was questioned before ever being taken to a commissioner.
>
> There was no evidence as to when he was taken to a commissioner, just that he was presented and he was held and prevented from being taken to the commissioner for

purposes of interrogation. That's where the voluntariness argument begins.

A deliberate delay in presentment for the purpose of interrogation should be given very heavy weight.... [The cases] conclude that a delay in presentment, particularly if it's for the purpose of gaining a confession or interrogation, should be given very, very heavy weight in the voluntariness analysis, more so than the other circumstances which have been discussed here.

And Officer McDonald admitted that the delay in presentment was for the sole purpose of interrogation and gaining a confession. And for that reason alone that statement should be suppressed, notwithstanding the other factors in the voluntariness analysis.

Defense counsel argued perfunctorily that the arguments made for suppression of the June 23, 2004, statement applied as well to the July 29, 2004 statement. The trial court rejected defense counsel's argument and determined that the statement was voluntary. The court determined:

I find the delay to be a brief one, all things considered, and he was promptly presented following this interrogation period of about an hour plus. I find the statement freely and voluntarily given and deny the request to suppress the statement.

Our independent constitutional appraisal of the record of the suppression hearing satisfies us that the trial court did not err. Contrary to defense counsel's assertion at the hearing on the motion, and to Ayala's assertion on appeal, Detective McDonald did not state that he deliberately delayed presenting Ayala to a commissioner so that he could obtain a confession. The detective simply stated that, upon Ayala's arrival at CID in Prince George's County, he and Detective Turner apprised Ayala of his rights and asked him if he wanted to make a statement.

Detective McDonald acknowledged that, despite being aware that arrangements could have been made to take Ayala before a judicial officer immediately, he did not make such

arrangements. The prosecutor's subsequent proffer to the court made clear, however, that the normal procedure in such situations was to await the arrival of Division of Correction personnel, who routinely arranged for the presentment of prisoners to court commissioners. Ayala acknowledges in his brief that, despite his assertions in the trial court that he was never presented to a judicial officer, he was presented to a court commissioner sometime on July 30, 2004. It is not clear from the record whether the presentment took place more than twenty-four hours after Ayala arrived at CID; however, "a delay in presentment, regardless of its purpose, will not result in automatic suppression of a confession." *Facon*, 375 Md. at 450, 825 A.2d 1096.

It is true that, when a "delay is not only violative of the Rule but deliberate and designed for the sole purpose of soliciting a confession, it must be given very heavy weight" in determining voluntariness. *Williams*, 375 Md. at 416, 825 A.2d 1078. Nothing in the record suggests that Detectives McDonald and Turner did anything more than take advantage of "necessary delay" in presentment due to the "routine administrative procedures" involved in processing Ayala's arrival in Maryland, such as coordinating paperwork and arranging for Ayala's pick-up by the Division of Correction. *Id.* at 420, 825 A.2d 1078. Absent some nefarious action on the part of the detectives, there was no reason for the court to weigh against the State the failure to present Ayala to a judicial officer immediately upon his arrival at CID.

## III

### Jury Instruction

Defense counsel asked the trial court to instruct the jury as follows:

Multiple participants in a crime do not necessarily share the same *mens rea*, or state of mind. Each joint participant enjoys a unique level of blameworthiness that neither controls nor is controlled by the level of blameworthiness of any other joint participant. . . . The *mens rea* for each principal

and accessory "floats free" and must be determined separately for each participant. ... Thus, to have a intent, it participant or intent. participant if one participant is determined more culpable state of mind or is possible to find that another has a less culpable state of mind The state of mind of each must be considered separately.

(Citations omitted.)

The trial court did not give the requested instruction and defense counsel objected at the close of jury instructions. Ayala now argues that the court's refusal to give the instruction amounted to reversible error.

Under Maryland Rule 4–325(c):

The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding.... The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

The trial court instructed the jury, in pertinent part, as follows:

Intent is a state of mind and ordinarily cannot be proven directly because there is no way of looking into a person's mind. Therefore, a Defendant's intent may be shown by surrounding circumstances. In determining the Defendant's intent, you may consider the Defendant's acts and statements, as well as surrounding circumstances. Further, you may, but are not required to, infer that a person ordinarily intends the natural and probable consequences of his acts and/or omissions.

\* \* \*

The Defendant is charged with the crime of murder. This charge includes first degree murder, second degree murder, and voluntary manslaughter.

The court went on to define the three offenses and to explain the requisite intent for each offense. In particular, the court specified that, in order to find Ayala guilty of first-

degree murder, the jury would have to conclude beyond a reasonable doubt that Ayala intentionally killed Urias with "willfulness, deliberation, and premeditation." That is, the jury would have to conclude that Ayala "actually intended to kill the victim" and "was conscious of the intent to kill," and that he "thought about the killing" beforehand, if only briefly. The court also specifically defined the intent required for the lesser offenses of second-degree murder and voluntary manslaughter.

The court then continued:

A person who aids and abets in the commission of a crime is as guilty as the actual perpetrator even though he did not personally commit each of the acts that constitutes the crime.

A person aids and abets the commission of a crime by knowingly associating with the criminal venture with the intent to help commit the crime, being present when the crime was committed, and seeking by some act to make the crime succeed.

In order to prove that the Defendant aided and abetted the commission of a crime, the State must prove, one, that the Defendant was present when the crime was committed; and two, that the Defendant willfully participated with the intent to make the crime succeed.

Presence means being at the scene or close enough to render assistance to the other perpetrators. Willful participation means voluntary and intentional participation in the criminal act. Some conduct by the Defendant in furtherance of the crime is necessary. The mere presence of the Defendant at the time and place of the commission of the crime is not enough to prove that the Defendant aided and abetted. But if presence is proven, it is a fact that may be considered along with all of the surrounding circumstances. However, presence at the scene of a crime can be sufficient if it was intended to and does aid the primary actor, for example, standing by as a lookout to warn the primary actor of danger.

To be sure, Ayala was tried separately from his accomplices. The jury was not asked to determine the intent of anyone but Ayala.

■ The instructions given by the trial court were virtually identical to Pattern Jury Instructions 4:17.2 (Homicide) and 6:01 (Aiding and Abetting). The court clearly defined the intents required for the various forms of homicide, and specifically informed the jury that, in order to be guilty as an aider and abetter to a particular form of homicide, Ayala must have harbored the requisite intent for that form of homicide. In short, the court's instruction clearly covered the applicable law; no further instruction was necessary. *See generally Roary v. State*, 385 Md. 217, 237, 867 A.2d 1095 (2005).

## IV

### Admission of Autopsy Photos

■ Finally, Ayala contends that the trial court committed reversible error by admitting into evidence, over defense counsel's objection, ten photographs of the victim's body that were taken at the medical examiner's office. The photos were shown to the jury in an enlarged form over a video monitor. Ayala argues that the photos were highly prejudicial but had no significant probative value or relevance. In his view, the photos "were clearly cumulative" of each other and of the testimony of the medical examiner, who described the victim's injuries in detail. Ayala adds that, even if the photographs themselves could have been properly admitted, the enlarged format in which they were displayed rendered them unduly prejudicial.

As the Court of Appeals has explained:

[T]he general rule regarding admission of photographs is that their prejudicial effect must not substantially outweigh their probative value. This balancing of probative value against prejudicial effect is committed to the sound discretion of the trial judge. The trial court's decision will not be disturbed unless "plainly arbitrary," ... because the trial judge is in the best position to make this assessment.

Photographs must also be relevant to be admissible. We have found crime scene and autopsy photographs of homicide victims to be relevant to a broad range of issues, including the type of wounds, the attackers intent, and the *modus operandi....* The relevancy determination is also committed to the trial judge's discretion.

*State v. Broberg,* 342 Md. 544, 552, 677 A.2d 602 (1996) (citations omitted) (footnotes omitted) (addressing admissibility, in prosecution of defendant for homicide by motor vehicle while intoxicated, of "in life" photograph of victim). In *Broberg,* the Court observed that

photographs [may be] relevant and possess probative value even though they often illustrate something that has already been presented in testimony.... The rationale for allowing photographs to be used to illustrate verbal testimony is that in some cases "photographs present more clearly than words what the witnesses were attempting to describe[.]"

*Id.* (citations omitted)(alteration in original).

In addition, the Court has

permitted the reception into evidence of photographs depicting the condition of the victim and the location of injuries upon the deceased, ... the position of the victim's body at the murder site, ... and the wounds of the victim.... On certain occasions, photographs have also been admitted to allow the jury to visualize the atrociousness of the crime—a circumstance of much import where the factfinder must determine the degree of murder.

*Johnson v. State,* 303 Md. 487, 502, 495 A.2d 1 (1985) (citations omitted) (holding, in prosecution for first-degree murder, that photographs showing injuries to victim's body were properly admitted into evidence). *See, e.g., Harris v. State,* 173 Md. App. 71, 91–93, 917 A.2d 1162, 1173–74 (2007) (holding, in automobile manslaughter case, that photographs of victim's body at accident scene were properly admitted into evidence); *Roebuck v. State,* 148 Md.App. 563, 594–600, 813 A.2d 342 (2002) (holding, in prosecution for first-degree murder, that photographs of victim's body were properly admitted into

evidence in that they illustrated testimony of medical examiner and were probative as to issue of intent).

The murder indictment against Ayala included first-degree murder, second-degree murder and voluntary manslaughter. Ayala's intent was a crucial issue in the case. The State posited that Ayala struck Urias repeatedly with a golf club, that he intended to kill Urias and that he acted with willfulness, deliberation and premeditation. The defense contended that Ayala acted in self-defense or defense of others, or that he struck Urias only once, reluctantly, because he was pressured to do so by the accomplices. The photographs illustrated the nature and severity of the victim's injuries. As the prosecutor argued in closing, they showed that Urias had been beaten "so badly as to be almost unrecognizable," and suggested that the persons who took part in the beating could not have been unaware that they were killing the victim. Under the circumstances, the photographs were highly relevant and highly probative. Moreover, Ayala offers this Court no reason to believe that the format in which the photographs were presented increased their prejudicial effect in any measurable way.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED.**

**APPELLANT TO PAY THE COSTS.**