19 A.3d 431

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

John Michael COPPOLA.

Misc. Docket AG No. 5, Sept. Term, 2010.

Court of Appeals of Maryland.

April 29, 2011.

Glenn M. Grossman, Bar Counsel (Attorney Grievance Commission of Maryland), for petitioner.

John J. Connolly, Esq. of Zuckerman Spaeder, Baltimore, for respondent.

Submitted to BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, J.

John Michael Coppola, Respondent, was admitted to the Bar of this Court on October 20, 1997. On February 24, 2010, the Attorney Grievance Commission ("Petitioner" or "Bar Counsel"), acting pursuant to Maryland Rule 16–751(a),[1] filed a "Petition for Disciplinary or Remedial Action" against Coppola, charging numerous violations of the Maryland Rules of Professional Conduct ("MRPC" or "Rule"), including Rule 1.2(d) (Scope of Representation),[2] Rules 3.3(a)(1) and (a)(2) (Candor Toward the Tribunal),[3] and Rules 8.4(a), (b), (c), and (d) (Misconduct),[4] with regard to estate planning services provided to the children of Elizabeth West, while Ms. West lay "unconscious or semi-conscious" in the hospital.

This Court referred the matter to Judge Ronald H. Jarashow of the Circuit Court for Anne Arundel County for a

---

1. Rule 16–751(a) provides:

 (a) **Commencement of disciplinary or remedial action.**
 (1) Upon approval of the Commission. Upon approval or direction of the [Attorney Grievance] Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

2. Rule 1.2(d) provides:

 (d) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.

3. Petitioner withdrew, at the conclusion of the hearing, the charge that Coppola violated or attempted to violate Rule 3.3.

4. Rule 8.4 provides:

 It is professional misconduct for a lawyer to:
 (a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
 (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
 (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
 (d) engage in conduct that is prejudicial to the administration of justice; . . . .

hearing to determine findings of fact and conclusions of law pursuant to Maryland Rule 16–757 (Judicial Hearing).[5] On June 23, 2010, Judge Jarashow held an evidentiary hearing, during which Coppola was represented by counsel, and thereafter, issued Findings of Fact and Conclusions of Law, in which he found, by clear and convincing evidence, that Coppola's acts and omissions constituted violations of Rules 1.2(d) and 8.4(a), (b), (c), and (d). In so doing, Judge Jarashow made the following findings regarding Coppola's background:[6]

## I. FINDINGS OF FACT.

5. Rule 16–757 provides:

(a) **Generally.** The hearing of a disciplinary or remedial action is governed by the rules of evidence and procedure applicable to a court trial in a civil action tried in a circuit court. Unless extended by the Court of Appeals, the hearing shall be completed within 120 days after service on the respondent of the order designating a judge. Before the conclusion of the hearing, the judge may permit any complainant to testify, subject to cross-examination, regarding the effect of the alleged misconduct. A respondent attorney may offer, or the judge may inquire regarding, evidence otherwise admissible of any remedial action undertaken relevant to the allegations. Bar Counsel may respond to any evidence of remedial action.

(b) **Burdens of proof.** The petitioner has the burden of proving the averments of the petition by clear and convincing evidence. A respondent who asserts an affirmative defense or a matter of mitigation or extenuation has the burden of proving the defense or matter by a preponderance of the evidence.

(c) **Findings and conclusions.** The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed. Unless the time is extended by the Court of Appeals, the written or transcribed statement shall be filed with the clerk responsible for the record no later than 45 days after the conclusion of the hearing. The clerk shall mail a copy of the statement to each party.

(d) **Transcript.** The petitioner shall cause a transcript of the hearing to be prepared and included in the record.

(e) **Transmittal of record.** Unless a different time is ordered by the Court of Appeals, the clerk shall transmit the record to the Court of Appeals within 15 days after the statement of findings and conclusions is filed.

6. We have excluded any references to exhibits or transcripts that are contained in the hearing judge's written findings of fact and conclusions of law.

## A. BACKGROUND FACTS

Respondent, John M. Coppola, was born in 1960. Mr. Coppola was admitted to the Virginia Bar in 1989 and to the Maryland Bar in 1997. He currently lives in Upperville, Virginia, and practices law principally out of the Leesburg, Virginia office of Ryan & Coppola.

Mr. Coppola was raised in Northern Virginia and he attended Catholic elementary school and high school in that area. In 1982, he earned a B.A. in economics from Union College in Schenectady, New York. He then attended graduate school at Boston College, earning an M.B.A. with a concentration in marketing in 1984, at the age of 23.

After earning his M.B.A., Mr. Coppola returned to Northern Virginia and worked as the Director of Marketing for Washington Business School, a trade school then owned by Mr. Coppola's parents. In 1985, Mr. Coppola began attending law school at night at American University, Washington College of Law while working full time. He earned his J.D. from American University in December 1988, and was admitted to the Bar of Virginia in 1989.

John Coppola, the Respondent, has been a member of the Maryland Bar since 1997. He has practiced law from an office in Leesburg, Virginia since 2000 and concentrates his practice in the area of estates and trusts.

After passing the Virginia Bar, Mr. Coppola continued in his marketing position at Washington Business School, while also taking on a few legal duties for the School. In or about 1996, Mr. Coppola formed a partnership with John Ryan, an estates and trusts lawyer and lifelong friend. Mr. Ryan had recently opened a solo practice in Fairfax. Mr. Coppola audited courses at American University's law school to learn the basics of estates and trusts practice.

In 1997, Mr. Coppola opened an office of Ryan & Coppola in Towson, Maryland. He closed the Towson office in 2000 and relocated his practice to Leesburg, Virginia, much closer in distance from his home. From 2000 through the

present, Mr. Coppola has worked from the Leesburg office while Mr. Ryan works from a Fairfax office.

Mr. Coppola was married in 1987 to Patricia DiSalle Coppola. The Coppolas have four children, a girl who is now 15, and triplets (two boys and a girl) who are now 13. The triplets were born premature and have had significant health issues, particularly early in life. Two of the children have continuing health and developmental issues that consume a significant portion of Mr. Coppola's time and income.

The Coppolas were divorced in 2002, but Mr. Coppola maintains very close ties to his ex-wife and children. Patricia Coppola currently works as an assistant for Ryan & Coppola. She and the children live in Mr. Coppola's former home in Vienna, Virginia. Although Mr. Coppola lives about an hour away, he spends a substantial portion of each day with his children and his ex-wife. On most weekdays, he leaves the office in the late afternoon, meets the children at their house, prepares and serves them dinner, and takes one or more to various evening activities like boy scouts or sports practices, before driving an hour back to his house in Upperville. On weekends he also meets with the children and takes them to various activities.

Mr. Coppola is the principal provider for his children. He has alimony and child support obligations in excess of $36,000 per year. He also pays health insurance in excess of $36,000 per year, a consequence of his children's preexisting health problems. Mr. Coppola testified that he is behind in his health insurance payments as a result of a substantial decrease in his income, as described in more detail below.

Since 1997, Mr. Coppola has practiced in the area of estates and trusts. He estimates that he has represented 950 to 1,000 clients over the course of his practice and that 80 percent of his clients today are Virginia residents and about 20 percent are Maryland residents.

Mr. Coppola consciously chose estates and trusts work because he believed he could help his clients without simul-

taneously harming others, unlike the nature of other legal practice areas, like litigation, which involve clients in dispute with others. Mr. Coppola typically represents middle-aged and middle-income individuals and families in estate planning and trust matters. He believes that many people in this demographic neglect their estate-planning needs in part because of the expense and difficulty of retaining a lawyer, and he has been known to reduce or waive his fee for clients who cannot afford to pay.

Mr. Coppola has never been disciplined by any bar association or court.

The hearing judge then described Coppola's contact with Elizabeth West's daughter, Jeanne Swink, which ultimately led to the series of events in issue here:

## B. ALLEGED VIOLATIONS—ESSENTIAL FACTS.

In 2001, Mr. Coppola represented a Virginia couple named Jeanne and Richard Swink in preparing a typical estate plan. At that time, Ms. Swink mentioned that her mother, Elizabeth L. West, was getting older and lacked an adequate estate plan. Mr. Coppola invited Ms. Swink to have her mother get in touch with him, but Ms. West did not do so at that time.

Mr. Coppola stayed in touch with Ms. Swink over the years. In approximately December 2007, Ms. Swink mentioned to Mr. Coppola's ex-wife that Ms. West needed an estate plan. Ms. West, however, did not contact Mr. Coppola at that time.

In or about June 2008, Ms. Swink again contacted Mr. Coppola about an estate plan for Ms. West. On this occasion, Ms. Swink indicated that her mother was ill. Mr. Coppola recalls that he spoke by phone with Ms. West on this occasion. The Respondent testified that the conversation lasted approximately fifteen minutes and that Ms. Swink was also involved in the conference. This conversation appears to be the only one that Respondent had with Ms. West concerning her estate plan. He learned that Ms. West had an existing Will, drafted in 1995, that left all her

assets in equal shares to her four adult children. Mr. Coppola subsequently obtained a copy of the 1995 Will, which was introduced into evidence in this case.

Mr. Coppola also learned that Ms. West had one significant probatable asset, a house in Prince George's County, Maryland, and that Ms. West wanted to leave her estate to her four children in equal shares, with a minimum of fees and expenses. Mr. Coppola recommended that Ms. West enter into an estate plan that would include a new Will, a trust declaration, an assignment of property to the trust, and a deed transferring the house to the trust. Under Mr. Coppola's plan, a revocable "Living Trust" would be created during Ms. West's lifetime. Ms. West would be named as trustee and would have full control of trust assets during her lifetime. The Deed would transfer ownership of the house to the Living Trust, and the Assignment would pass untitled personal property to the Trust. Upon Ms. West's death, the Living Trust automatically would be converted to an irrevocable "Family Trust," whose assets would be distributed to each child in equal shares.

The principal purposes of this estate plan were to ensure that Ms. West's major asset did not become part of her probatable estate with the goals of (1) avoiding the fees and expenses chargeable in probate proceedings; (2) allowing the trustee to sell the house readily and without delay or complications of probate; and (3) accomplishing the same distribution as would be carried out in formal probate.

Mr. Coppola also explained to Ms. West that he would prepare a general durable power of attorney and related medical powers of attorney as part of a normal estate plan for a person in her circumstances. She did not formally ask him to prepare the documents at that time.

Ms. West, herself, did not follow up ever again with Mr. Coppola.

The hearing judge then described what happened on August 25, 2008, when Ms. Swink asked Coppola to meet with her

family at a hospital in Fairfax, Virginia, where Ms. West was a patient:

On or about August 25, 2008, Mr. Coppola received another phone call from Ms. Swink. Ms. Swink said that Ms. West was in a hospital in Fairfax, Virginia. Ms. Swink informed him that Ms. West wanted to go forward with the estate plan they had previously discussed. At this time, however, Mr. Coppola had no direct conversation with Ms. West.

Based on the phone call from Ms. Swink, on or about August 25–26, 2008, Mr. Coppola prepared the documents he had previously described to Ms. West using templates available in his practice. Those documents include the 2008 Will; the Elizabeth L. West Trust Declaration; a Deed transferring the Prince George's house to the Trust; an Assignment transferring personal property to the Trust; and a General Durable Power of Attorney. Mr. Coppola also prepared other medical estate-planning documents, but because of the events described below, these documents were not signed.

The Court finds that the estate plan designed by Mr. Coppola was reasonable and appropriate for a person in Ms. West's circumstances. The Court also finds that $2548 (a fee of $2500 and $48 in expenses), the amount Mr. Coppola charged for these services, was a reasonable fee for preparing and implementing the estate plan. For these findings, the Court relies in part on the testimony of A. MacDonough Plant, Esq., who testified as an expert on estates and lawyers in Maryland. He reviewed the estate plan documents and charges and testified that they were appropriate for an elderly woman who was terminally ill, whose estate was dominated by a house worth approximately $250,000, and who wanted to bequeath her assets to her children in equal shares. Petitioner did not present any contrary evidence. But Respondent's expert testified that, in his opinion, the Respondent was not entitled to a fee given the circumstances surrounding the execution of the documents.

In accordance with Ms. Swink's instructions, Mr. Coppola took copies of the estate planning documents to the hospital in Fairfax, Virginia, on August 26, 2008, where he understood Ms. West was a patient. Mr. Coppola expected to review the documents with Ms. West at the hospital, and to have her execute them after review and consultation.

When Mr. Coppola arrived at the hospital, he found all four of Ms. West's children (along with Richard Swink) present in Ms. West's hospital room. Mr. Coppola learned that Ms. West had taken a sharp turn for the worse, although the date of her losing competency was not established. She was either unconscious or semi-conscious, but undisputedly was in no condition to review or execute the estate-planning documents. Ms. West was in the end stages of a battle with colon cancer and it appeared unlikely that she would return to consciousness. The family was manifestly distraught at their mother's condition and several of the children were openly crying.

Mr. Coppola explained to the children why he was there and what the documents he had drafted were intended to do. (Ms. Swink, of course, already knew why Mr. Coppola was there.) He explained the purpose of the estate-planning documents as set forth above, including the fact that the plan might save the estate approximately $10,000 in probate fees and expenses, primarily attorney's fees, by placing the house into a trust. He also explained how the trust worked and why it would not affect the children's inheritances except to increase the size of the distribution to the trust beneficiaries (i.e., the four children) compared to a probated estate that would have paid attorneys fees and expenses before distribution to the four children. Mr. Coppola had drafted the trust declaration to name Ms. Swink as the successor trustee, but the children requested that all four of them serve as the successor trustee, and Mr. Coppola agreed to make this change later, after signing of the documents. The trust was drafted, however, to ensure that each of the children would be the sole trustee of his or her share upon reaching age 25 and because all the children

were already over age 25, each child would maintain control over his or her share.

Mr. Coppola estimated $10,000 in savings based on an estimated value of $250,000 for Ms. West's house. Those savings roughly comport with the allowable statutory compensation for personal representatives and special administrators set forth in § 7–601 of the Estates and Trusts Article of the Maryland Code. The Court finds that even though the Personal Representative could have waived this fee, Mr. Coppola's savings estimate was reasonable because a fee of roughly the same amount likely would have been charged by counsel for the personal representative and counsel's agents, such as an accounting firm.

The Court finds that Mr. Coppola reasonably believes that the personal representative of Ms. West's estate would have needed to hire an attorney if the 1995 Will were admitted to probate. Ms. Swink, the personal representative under the 1995 Will, was a Virginia resident, and the probate proceedings would have been in Prince George's County, Maryland. In addition, because Ms. West's house would have been part of the probatable estate under the 1995 Will, the probate proceedings would have been sufficiently complex to require the assistance of counsel. The Court relies in part on the testimony of Mr. Plant for this finding.

Mr. Coppola's testimony that the August 2008 documents reflected Ms. West's intent is bolstered by comparing the relevant provisions of the 1995 Will and the 2008 Will and Trust Declaration. Under both the 1995 Will and the 2008 estate plan, Ms. West's assets would be shared in equal proportion by her four adult children. Nothing in the 2008 estate plan modifies the share any beneficiary would have received under the 1995 Will. No evidence was presented suggesting that Mr. Coppola's proposed estate plan did not reflect Ms. West's intent, and whether Mr. Coppola engaged in best practices to determine Ms. West's intent is not at issue in this proceeding. There is no evidence as to whether this remained Ms. West's intent in August 2008.

After learning that Ms. West was not capable of executing the documents, Coppola was approached by Ms. West's four children regarding the possibility of Ms. Swink forging Ms. West's signature on the documents, which Coppola facilitated:

Mr. Coppola testified that Ms. West's children asked whether they could sign the estate-planning documents on Ms. West's behalf as they recognized the cost savings to be gained if the documents could be utilized. Mr. Coppola told them that they could not legally do so. He explained that some of the documents needed to be witnessed and certified.

Notwithstanding these explanations, the children pleaded with Mr. Coppola to certify Ms. Swink's execution of the documents in her mother's name. He explained that if the children were not in agreement with the provisions of the estate plan, then it would be counterproductive to sign Ms. West's name to the documents. He told the children that such a course would be improper and, if anyone of the children objected, the documents would not be honored. The children indicated to Mr. Coppola that they were, in fact, in agreement. Mr. Coppola, to his regret, agreed to have them sign the documents and that he would certify that they were signed by Ms. West. Ms. Swink then signed her mother's name to the 2008 Will, the Trust Declaration, the Deed, the Assignment, and the General Durable Power of Attorney. All four children were present in the hospital room and witnessed Ms. Swink's execution of her mother's name on the documents. Mr. Coppola hand-wrote the change to the Trust Declaration (naming all four children as successor Trustees) and Ms. Swink initialed the change.

The hearing judge noted that, after Ms. Swink forged Ms. West's signature on the estate planning documents, Coppola returned to his office, changed the identity of the successor trustee in the Trust Declaration from Ms. Swink alone to all four children acting together and proceeded to notarize the falsely-executed Will, the Trust Declaration and Schedule, the Power of Attorney naming Ms. Swink as Ms. West's attorney-in-fact, and the Deed transferring the property from Ms. West to the Elizabeth L. West Living Trust. He thereafter direct-

ed two of his employees to falsely attest that they witnessed Ms. West's Will, despite the fact that Ms. West's signature was not on the Will and neither employee was present to see Ms. West execute her Will, and notarized their attestations despite knowing that they were false.

Mr. Coppola then returned to his office in Leesburg with the documents. There, consistent with the instructions he received from the children, he changed the identity of the successor trustee in the trust declaration from Ms. Swink alone to all of the children acting unanimously. The Respondent notarized the falsely executed and initialed Will; he notarized the falsely executed trust declaration and schedule; he notarized the falsely executed power of attorney naming Ms. Swink as Ms. West's attorney-in-fact and he notarized the falsely executed deed transferring the property from Ms. West to the Elizabeth L. West Living Trust.

Respondent's ex-wife, Patricia Coppola and his mother, Katherine Coppola, both worked in the Respondent's law office on August 26, 2008. The Respondent admitted that, at his direction, he had each of them execute Ms. West's Will as witnesses despite the fact that Ms. West was not present and despite the fact that her signature was not on the Will. His notarization of the Will included the false recital that stated, in effect, that Ms. West and the witnesses, Katherine and Patricia Coppola, appeared in each other's presence and in the Respondent's presence and that Ms. West declared that the instrument was her Last Will and Testament, that it was willingly executed in the presence of the witnesses, that the witnesses stated that they, in the presence of Ms. West, and at her request, subscribed their names as witnesses. The witnesses falsely swore to their attestation and the Respondent notarized it knowing that those oaths were false. Mr. Coppola certified or notarized the signatures by Ms. Swink on the Will, Trust, Deed, and Durable Power of Attorney.

The hearing judge then described that, after amending the Trust, notarizing the falsely-executed Will, Trust Declaration

and Schedule, Power of Attorney, and Deed, and directing his employees to falsely attest regarding Ms. West's Will, Coppola returned to the hospital the next day and gave the original documents to Ms. Swink; he then certified that the Deed was prepared by him or under his supervision and directed his employee to record the falsely-executed Deed in the land records of Prince George's County:

The next day, August 27, 2008, Mr. Coppola personally returned the original documents to the hospital room and gave them to Ms. Swink.

Respondent certified that the deed was prepared by him or under his supervision, and he notarized the false signature of Ms. West. When he returned to his office, he sent his clerk to record the deed with the Prince George's County land records office. Although the Respondent's employee had some initial difficulty in finding the courthouse, the Clerk of the Circuit Court for Prince George's County recorded the deed on August 28, 2008, after Ms. Swink paid outstanding property taxes. He also had an employee of his office record the Deed in the land records for Prince George's County, Maryland.

Ms. West died on August 30, 2008, without having recovered.

Mr. Coppola testified that he was affected by the entreaties of the children and that the situation was extremely emotional. The emotional character of the hospital room, he claimed, carried over to his office where he amended the Trust, had his ex-wife and mother perjure themselves, and directed his clerk to file a deed he knew was falsely signed and notarized. Despite the emotional character of the situation, the Respondent suffered no cognitive deficits and knew what he was doing and that it was wrong. The Respondent never told Ms. Swink, whom he testified was also his client, of the criminal implications of the course of action of which he agreed to be a part. When asked at trial about the nature of the criminal implications, he replied, "I guess fraud."

Finally, the hearing judge described how Bar Counsel became aware of Coppola's actions:

### C. FACTS AFTER DOCUMENT EXECUTION.

On September 12, 2008, Ms. Swink filed the 2008 Will with the Register of Wills for Prince George's County, Maryland, and she simultaneously petitioned for administration of a regular estate. Ms. Swink did not retain Mr. Coppola to represent her in the probate proceedings, nor did she notify him that she had filed the 2008 Will or opened the estate.

In or about December 2008 or January 2009, Richard Swink called Mr. Coppola and said that one of Ms. West's children, Richard R. West Jr., was contesting the sale of Ms. West's house. Mr. Coppola understood that Richard West wanted to continue to live in the house and he was threatening to raise the false signatures as a means of impeding the sale of the house. Mr. Coppola was surprised at the position of Mr. West since Mr. West had been present in the hospital room and participated in the decision-making. Nevertheless, Mr. Coppola understood that Mr. West's allegations would have serious implications for the estate and for himself. He offered to file a Deed of Correction in the land records for Prince George's County, which would have had the effect of undoing the transfer of the house to the Trust. Mr. Swink said he would discuss the matter with the family and get back to him.

Mr. Coppola did not hear from Mr. Swink or from the family. Instead, Mr. Coppola was contacted by an attorney for Ms. Swink, George Meng, Esq. Ms. Swink hired Mr. Meng to represent her in the Orphan's Court after Mr. West began asserting his position. Mr. Meng, a member of the Maryland Attorney Grievance Commission, promptly filed grievances against Mr. Coppola with the disciplinary authorities in both Maryland and Virginia.

From the outset, Mr. Coppola did not contest the core accusations in the grievance filed with the Maryland Attorney Grievance Commission by Mr. Meng. Mr. Coppola offered to assist Mr. Meng in his representation of Ms.

Swink in the probate proceedings, including by authorizing Mr. Meng to disclose the filing of the grievance and by furnishing Mr. Meng with a letter that he could use in the proceedings if necessary. Through his counsel, Mr. Coppola sent a letter to the Commission admitting that he had facilitated Ms. Swink's execution of the estate documents in Ms. West's name and that he had improperly certified signatures on those documents. He stated that he "offers no excuse for his clearly improper actions," but instead offered a number of mitigating factors. Mr. Coppola has maintained that position throughout these proceedings. The Court finds as a fact that Mr. Coppola has cooperated with Bar Counsel to an extensive degree to his own detriment and in furtherance of the purposes of the Maryland Attorney Grievance Commission.

By letter dated June 22, 2010, sent to the attorney for the Estate of Elizabeth West, Mr. Coppola offered to reimburse the amount of $2,548 to the Estate as repayment for the amount of fees and expenses that Mr. Coppola was paid from the assets of Ms. West for his services performed.

Following his findings of fact, the hearing judge then rendered various conclusions of law:

## II. CONCLUSIONS OF LAW AS TO RULE VIOLATIONS.

Petitioner has alleged that Respondent violated two Rules of Professional Conduct: 1.2(d) and 8.4.[1] Petitioner represented in responses to interrogatories that it would not argue that Respondent violated any other Rule. Therefore, the Court will not consider any other potential violation. *See Attorney Grievance Comm'n v. Sapero,* 400 Md. 461, 486–87, 929 A.2d 483, 498 (2007) (due process considerations bar court from finding violations of rules not charged in petition for disciplinary or remedial action); *In re Ruffalo,* 390 U.S. 544, 550, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968) (attorneys entitled to notice of disciplinary charges and opportunity to present a defense). In particular, the Court does not consider whether any of the conduct at issue

constituted a violation of Rules 1.1 (competence), 1.6 (confidentiality), or 1.7 (conflicts of interest).

[1] In closing argument, Petitioner stated that it will not pursue a violation of Rule 3.3.

The Petitioner has the burden of proving the allegations of the petition by clear and convincing evidence. The Respondent, however, must prove any defense, matter of mitigation, or extenuating circumstances by a preponderance of the evidence. Md. Rule 16–757(b).

The hearing judge then outlined the parties' arguments regarding Coppola's alleged violation of Rule 1.2(d):

### A. VIOLATION OF RULE 1.2(d).

Rule 1.2(d) [2] provides in pertinent part that "[a] lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent. . . . " Petitioner alleges that Mr. Coppola violated Rule 1.2(d) by counseling or assisting the West family in falsely certifying their mother's signature on several estate plan documents and that this conduct included fraudulent or criminal components and that the Respondent identified Ms. Swink and all of the four children in the hospital room of Ms. West as "his clients." Petitioner alleges that the complete scenario of signing the documents and filing of the 2008 Will by Ms. Swink constituted a fraudulent scheme and/or the making of a false entry in violation of Md.Code Ann., Crim. Law § 8–606, which had the purpose of fraudulently avoiding probate.

[2] Rule 1.2. Scope of Representation and Allocation of Authority Between Client and Lawyer.

\* \* \*

(d) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.

Respondent argues that Rule 1.2(d) does not apply for a number of reasons. First, Rule 1.2(d) applies to a lawyer's facilitating or assisting a *client* in criminal or fraudulent

conduct and Coppola's client was Ms. West—not the children of Ms. West. Second, even if Ms. Swink was Mr. Coppola's client, Petitioner did not establish that Mr. Coppola assisted her in committing a criminal or fraudulent act. In this context, Respondent argues that Md.Code Ann., Crim. Law § 8–606(b)(1), was not violated. Third, Petitioner failed to prove by clear and convincing evidence that Mr. Coppola assisted Ms. Swink or others in conduct that Mr. Coppola knew was criminal or fraudulent.

The first conclusion of law identified Coppola's clients as Ms. West's four children, relying on various cases, including *Attorney Grievance v. Shoup*, 410 Md. 462, 979 A.2d 120 (2009), and *Attorney Grievance v. Brooke*, 374 Md. 155, 821 A.2d 414 (Md.2003), the block quotes from which will be omitted for brevity's sake:

## 1. ATTORNEY–CLIENT RELATIONSHIPS.

Respondent relies on *Attorney Grievance Comm'n v. Elmendorf*, 404 Md. 353, 946 A.2d 542 (2008), for the proposition that no attorney-client relationship was formed when a woman who had a social relationship with an attorney asked the attorney if she could avoid the one-year separation requirement to obtain a divorce. The attorney told her in writing that "[y]ou can file whatever you want so long as the parties say that it has been a year, the court won't question it so long as the parties agree to that." *Id.* at 355, 946 A.2d at 544. The Commission alleged that the attorney violated Rule 1.2(d) (among other rules), but the trial court rejected that contention on the ground that the Commission had not proved that the attorney represented the woman, even though the woman knew that the respondent was an attorney and the conversation clearly involved legal issues. The Commission did not even except to that finding, and the Court of Appeals appeared to endorse it. *See id.* at 361 n. 10, 946 A.2d at 547 n. 10.

Respondent argues that the evidence in this case established that Mr. Coppola's *client* was Ms. West and no evidence suggested that Mr. Coppola counseled Ms. West to engage in a crime or fraud, or that he assisted Ms. West in

committing a crime or fraud. Although Mr. Coppola discussed various matters with Ms. West's children and he certainly tried to help them achieve a goal that he believed they shared with their mother, Petitioner did not establish by clear and convincing evidence that Ms. Swink or her siblings were Mr. Coppola's clients in the matter before the Court.[3]

[3] Mr. Coppola had previously represented Ms. Swink in connection with her estate plan, but that matter ended many years earlier.

The question of who was Mr. Coppola's client is critical. He only spoke to Ms. West one time in June 2008 for a very short phone conversation, but never charged her a fee, never prepared any documents, and never confirmed her testamentary or estate planning wishes in any way that objectively proves her estate planning intent. In August 2008, Mr. Coppola only talked to Ms. Swink, his former client, who asked that he prepare the estate planning documents for her hospitalized mother. It is impossible to determine from the evidence that this request actually came from Ms. West or that Ms. West had the same estate planning intent as of August 25, 2008, as she had during the June 2008 conversation with Mr. Coppola or as she had in her 1995 Will. The issue of the attorney-client relationship or relationships that were formed can be analyzed in various ways.

The formation of an attorney-client relationship can be difficult to define.

\* \* \*

The *Brooke* case sets out a test that is more applicable to the instant case. The Court adopted a test that does not depend on whether a contractual relationship was formed, but relies on whether the lawyer communicated with a person and gave advice on a subject that required professional skill and judgment under circumstances where the purported client relied on the advice. In *Brooke*, the lawyer prepared legal documents and advice related to the documents for a friend. The Court concluded that there was an attorney-client relationship formed.

These principals can be applied in the instant case. Mr. Coppola asserts that only Ms. West was his client because he spoke with her in June 2008, prepared documents in August 2008 at the request of her agent (Ms. Swink, his former client), and invoiced Ms. West on August 28, 2008, for the work performed. By implication, he asserts that he did not represent any of Ms. West's four children. But this ignores the totality of the circumstances.

In the hospital room on August 25, 2008, it was clear to Mr. Coppola that Ms. West was mentally unable to execute the estate planning documents or confirm that the documents expressed her current intent. At best, he knew that the documents reflected whatever Ms. West had told Mr. Coppola in the conversation of June 2008. But, in August 2008, there was no way to determine whether the documents which were much more extensive than her 1995 Will really did meet with her approval, because she never reviewed any of the details of those documents. At a minimum, however, Mr. Coppola thought that he was acting on behalf of Ms. West when he created the documents before going to the hospital. The Court concludes, by clear and convincing evidence, that there was an attorney-client relationship between Mr. Coppola and Ms. West. This does not preclude that he also had an attorney-client relationship with the four children.

In the hospital, according to Mr. Coppola, he explained to the four children about the benefits to them that would be derived from the estate planning documents that he had prepared. He advised them that, if they all agreed, then the documents could be executed. He permitted the documents to be executed in all their presence. He failed to advise them about any criminal penalty or exposure to fraud that might occur against them from carrying out this plan even though Ms. West was incompetent. He then took the documents and, on behalf of the four children, made changes to reflect the agreement of the four children. He brought copies of the documents back to the four children the next day. He then proceeded to take actions to carry

out the plan he created with the four children, i.e., filing the deed and delivery of the documents to Ms. Swink to carry out transfers to the Trust and/or probate the estate at the appropriate time. In testimony, Mr. Coppola identified not only Ms. Swink as his client, but all of those in Ms. West's hospital room. Therefore, the court concludes, by clear and convincing evidence, that Mr. Coppola had an attorney-client relationship with the four children of Ms. West.

The hearing judge then concluded that Coppola assisted Ms. West's children in committing a criminal or fraudulent act:

## 2. WHETHER RESPONDENT ASSISTED A CRIMINAL OR FRAUDULENT ACT.

The Petitioner contends that the falsely notarized deed recorded in the Prince George's County land record office violated Md.Code Ann., Crim. Law § 8–606. *See Attorney Grievance Commission v. Goodman*, 381 Md. 480, 491, 850 A.2d 1157, 1164 (2004) (a violation of Section 8–606(b) of the Criminal Law Article is a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects and thereby violates Rule 8.4(b)). Petitioner argues that this also constituted a violation of Rule 1.2(d) of the Maryland Rules of Professional Conduct.

Respondent argues that, even if Respondent had an attorney-client relationship, he did not assist in a criminal or fraudulent act. Respondent focuses his post-trial memorandum on the filing of the 2008 Will with the Prince George's County Register of Wills as the alleged criminal or fraudulent act that violated Rule 1.2(d). The Court agrees with the Respondent that no evidence suggested that Mr. Coppola filed the 2008 Will with the Register of Wills or that he counseled Ms. Swink to do so. The undisputed evidence established that Ms. Swink filed the 2008 Will and opened the probate proceedings without Mr. Coppola's knowledge or advice. Mr. Coppola did not enter an appearance in the probate proceedings. The Court will not address whether it was a violation because of the mandate that Wills be filed with the Register of Wills and whether Mr. Coppola knew or should have known that the falsely executed Will had to

be filed. The Court does not reach the question of whether the Register of Wills is a tribunal. The Petitioner does not argue that this conduct violated Rule 1.2(d), contending instead that the filing of the deed violated Rule 1.2(d). It is noted, however, that the Petitioner does contend that Ms. Swink's filing of the Will with the Register of Wills does violate Rule 8.4(b), discussed below.

Under Md.Code Ann., Crim. Law § 8–606, making false entries in public records is a misdemeanor. A "public record" is defined so that it would include public land records. Md.Code Ann., Crim. Law § 8–606(a)(2). The prohibition applicable in the instant case specifically states that the conduct is to "willfully make a false entry in a public record." Md.Code Ann., Crim. Law § 8–606(b). The relevant inquiry is whether Mr. Coppola's actions met this requirement.

The meaning of "willful" in the context of a criminal act has been addressed in a number of cases. In a case concerning aiding and abetting a crime, the trial court added the following definition: "Willful participation means voluntary and intentional participation in the criminal act." *McMillan v. State,* 181 Md.App. 298, 335, 956 A.2d 716, 737 (2008). In a murder case, the trial court defined "willful" as: "Willful participation means voluntary and intentional participation in the criminal act. Some conduct by the Defendant in furtherance of the crime is necessary." *Ayala v. State,* 174 Md.App. 647, 677, 923 A.2d 952, 970 (2007). *See also Wagner v. State,* 160 Md.App. 531, 562, 864 A.2d 1037, 1055 (2005); *Perry v. State,* 150 Md.App. 403, 423, 822 A.2d 434, 446 (2002) (same defining words used).

These definitions can be applied to the present facts. Mr. Coppola falsely certified that the deed was signed by Ms. West and notarized her signature that he knew to be false. His notary certification states: "Acknowledged before me this 26th day of August, 2008, by Elizabeth L. West, an individual known to me and described in the foregoing instrument." Then, he filed the deed in the Land Records of Prince George's County. These actions were voluntary

and intentional participation in the filing of the false deed. Mr. Coppola took an act in furtherance of the statutory violation by sending his clerk and straightening out the administrative problem that arose in filing the deed. The Court concludes that there is clear and convincing evidence that Mr. Coppola willfully made a false entry in the public record by filing the deed in violation of Md.Code Ann., Crim. Law § 8–606.

The hearing judge thereafter rejected Coppola's assertion that he did not intend to commit a criminal or fraudulent act:

### 3. WHETHER RESPONDENT KNEW CONDUCT WAS CRIMINAL OR FRAUDULENT IN PURPOSE.

Respondent argues that there was no violation of Rule 1.2(d) by focusing on whether Mr. Coppola knew that his conduct was criminal or fraudulent versus a bona fide intent to carry out the lawful wishes of his client, Ms. West. Mr. Coppola argues that a fraud under Rule 1.2(d) ordinarily implies an intention to deceive a person or entity and resulting injury, and it requires proof of a misrepresentation of material fact. *E.g., Attorney Grievance Comm'n v. Culver*, 381 Md. 241, 275, 849 A.2d 423, 444 (2004) (violation of Rule 1.2(d) to advise client to take out loans with the intent of discharging the loans in bankruptcy, because that act would be "fraudulent as to both present and future creditors"). Since Mr. Coppola was not intending to deceive or harm any person or entity, but rather, was trying to accomplish his client's lawful objective, Respondent argues that the Court should find that Mr. Coppola's acts did not deceive any of Ms. West's heirs or legatees under the 1995 Will, nor were they intended to deceive or harm any other person or entity.

Rule 1.2(d) prohibits assisting a client in conduct the lawyer knows to be criminal or fraudulent. Executing false estate planning documents and filing them on the public records or knowing the high probability or necessity that those false documents are going to be filed and relied on in the future as truthful and accurate violates this Rule. At a minimum, the public relies on those records. Future buyers

or transferees of the real property would rely on the documents. Although the heirs appeared to be in agreement and would receive a savings and higher distribution comparable to the 1995 Will of Ms. West, there was really no evidence confirming that the August 2008 estate planning intent was, in fact, the same as her June 2008 or 1995 testamentary intent. Therefore, the court rejects this defense to a violation of Rule 1.2(d).

With respect to the violation of Rule 8.4, Judge Jarashow noted that Coppola conceded that he violated of Rules 8.4(a) and (c) and concluded that Coppola also violated Rule 8.4(b) and (d):

### B. VIOLATION OF RULE 8.4.

Finally, Petitioner contends that Mr. Coppola violated Rules 8.4(a), (b), (c) and (d) of the Maryland Rules of Professional Conduct. Respondent concedes that his conduct constitutes a violation of Rule 8.4(c) and that there probably was also a violation of Rule 8.4(a), but argues that there was no violation of Rules 8.4(b) or (d).

Rule 8.4 addressed "Misconduct" generally:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

Maryland Rules of Professional Conduct, Rule 8.4.

The parties concede that Rule 8.4(a) and (c) were violated. The Court agrees. The facts establish by clear and convincing evidence that Mr. Coppola engaged in "conduct involving dishonesty, fraud, deceit or misrepresentation" for all

the reasons stated in the discussion concerning violating Rule 1.2. He permitted false and fraudulent documents to be executed and filed on public record, falsely certified that Ms. West and witnesses had signed various documents and had his staff falsely certify signing documents. This is a clear violation of Rule 8.4(c) which necessarily violates Rule 8.4(a).

As to whether Respondent violated Rule 8.4(b), this is answered by the discussion above concerning Rule 1.2(d). The Court has determined that Mr. Coppola violated Md. Code Ann., Crim. Law § 8–606. Therefore, it necessarily follows that there is a violation of Rule 8.4(b). A defense might be that the criminal act does not reflect "adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." This might be the case, for example, if a lawyer gets convicted of a speeding ticket or Driving While Intoxicated. But in the instant case, the Court finds that there is a clear and convincing evidence that reflects on the lawyer's honesty or fitness. Mr. Coppola permitted others to falsely sign another's name to official documents being filed with the public record or on which others were going to rely. There were implications for him and for those falsely signing. He notarized signatures falsely.

Rule 8.4(d) covers "conduct that is prejudicial to the administration of justice." As the Court of Appeals has explained, "[o]nly conduct that is criminal or so egregious as to make the harm, or potential harm, flowing from it patent will be deemed prejudicial to the administration of justice." *Attorney Grievance v. Marcalus*, 414 Md. 501, 522, 996 A.2d 350, 362 (2010) (citations and internal quotations omitted). But the Court of Appeals also has stated that "conduct that impacts on the image or the perception of the courts or the legal profession . . . and that engenders disrespect for the courts and for the legal profession may be prejudicial to the administration of justice." *Id., citing Attorney Grievance Comm'n v. Richardson*, 350 Md. 354, 368, 712 A.2d 525, 532 (1998) (citation omitted). In the instant case, the Respondent both committed a misdemeanor and acted in a way that

damages the perception of the legal profession. *See also Attorney Grievance v. Guberman,* 392 Md. 131, 896 A.2d 337 (2006) (attorney who prepared fictitious appellate pleadings, which he supported and certified as true, violated Rules 8.4(c) and (d)). The Court finds that there was clear and convincing evidence for a violation of Rule 8.4(d).

Following his conclusions of law, the hearing judge presented mitigation findings:

### III. FACT FINDINGS AS TO MITIGATION.

The Court finds that Respondent proved the following mitigating factors by a preponderance of the evidence.

The Court finds that Mr. Coppola cooperated with Bar Counsel in these proceedings to an exceptional degree. He acknowledged from the outset that his conduct was wrong and he never contested the core allegations made by the complaining witness. As a result of his cooperation, none of the family members was required to testify in these proceedings. The Commission's case in chief at the hearing took a short time to present and was accomplished through documents and admissions. From the outset, all parties agreed that this case primarily focuses on mitigation.

Respondent did not intend to cause harm to a client or to any other person or entity. On the contrary, the evidence established that Mr. Coppola was trying to achieve a good result for Ms. West's beneficiaries and what he thought Ms. West wanted based on his brief conversation with her in June 2008 and in her 1995 Will. To the extent that Ms. West was his client, he thought he was carrying out her wishes. To the extent that the beneficiaries were his clients, he thought he was carrying out their wishes. He had no intent to deprive any person or entity of assets, tax proceeds, or fees. He was focused on benefitting everyone even though he knew that his and their conduct was wrong.

Respondent did not act out of a selfish motive and was acting against his self-interest. The preponderance of the evidence established that Respondent was not attempting to benefit his own interests by agreeing to certify the estate-

planning documents. There is evidence that points to both an economic benefit for and against Mr. Coppola. Mr. Coppola believed that he had earned a fee irrespective of whether he agreed to certify the documents. But, in fact, because Ms. West lacked capacity in August 2008, when he supposedly had instructions to proceed with preparing the estate planning documents, there never was an attorney-client relationship confirmed by Ms. West. Even though Mr. Coppola believed he earned his fee by preparing the documents, there is serious question whether he was entitled to a fee from Ms. West. Earning a fee, however, did not appear to motivate Mr. Coppola as discussed in this mitigation section. There was evidence that Mr. Coppola might have financially benefitted from not preparing, executing and certifying the documents because he anticipated that his former client, Ms. Swink, was likely to hire him to probate Ms. West's estate in Prince George's County, through which he would have most likely earned a fee of around $10,000. If his motive was selfish, he would have benefitted more by convincing the family that he could probate the estate for a fee that would have exceeded the $2548 fee he invoiced for preparing the estate planning documents.

Agreeing to permit the family to execute the documents and make changes in them also required Mr. Coppola to invest more of his time beyond the mere preparation of the documents to his economic detriment. His invoice reflects that he charged only for preparing the documents. He invested substantially more time in the matter by traveling an hour each way to the hospital for a second meeting, modifying the Trust Declaration, arranging to have the documents witnessed, and managing the filing of the Deed in Prince George's County. Mr. Coppola did not seek or obtain an additional fee for these acts.

Mr. Coppola's conduct also is mitigated by a lack of premeditation and by his impulse to help a family in distress. No evidence suggested that Mr. Coppola went to the hospital on August 26, 2008, with the intention of procuring false signatures and, on the contrary, the Court concludes

that he expected to find Ms. West conscious and available for consultation. Instead, he found a distraught family assembled at their mother's deathbed. He correctly informed them that Ms. West's condition precluded signing the documents. The circumstances became emotional and evoked in Mr. Coppola an emotional reaction. The Court finds that his conduct was motivated by sympathy for the family.

The Court finds, based on the undisputed evidence, that Respondent has no prior disciplinary record.

The Court finds that Mr. Coppola has expressed genuine remorse for his conduct. His testimony and demeanor at the hearing made clear that he understands and regrets the gravity of his conduct. He apologized to the Court and explained how his conduct violated his own concept of himself as an attorney who adheres to high moral standards. His partner and his brother-in-law both testified that Respondent disclosed his conduct to them shortly after it came to light and expressed his remorse. Respondent apologized to his partner and to his ex-wife and mother. He visited a psychologist to try to obtain insight about his own behavior.

The Court finds that Mr. Coppola has not engaged in a pattern of misconduct and that the incident at issue in these proceedings was an aberration. Mr. Coppola testified that he had never engaged in similar acts either before or after the August 2008 episode. Mr. Coppola's law partner and friend of 40 years testified that he has never had any reason to suspect that Mr. Coppola engaged in another similar incident. Mr. Coppola has represented approximately 1,000 clients in estates and trusts matters, and no similar instance has emerged.

The Court finds that Mr. Coppola is a person of good character. Mr. Coppola has stressful family and personal circumstances that he manages with dignity and grace. He is the father of four children, including three triplets who were born severely premature and have had substantial health problems. Although Mr. Coppola is divorced and the children live with his ex-wife, Mr. Coppola is intensely

involved in raising his children. He spends a good part of nearly every day with his children—preparing dinner for them, supervising their after-school activities, and accompanying them to various commitments. Mr. Coppola has significant financial, responsibilities to his family, including alimony and child support obligations in excess of $36,000 per year and health insurance costs also in excess of $36,000 per year. Mr. Coppola's income from his law practice barely covers these costs, and he testified that he is currently behind on his health insurance payments. Yet Mr. Coppola is known to waive or reduce his fees for clients who themselves are in difficult financial circumstances.

Mr. Coppola has made sincere efforts to rectify and mitigate the effects of his conduct. He offered to file a deed of correction in the land records, if the West beneficiaries believed that would be useful. He assisted Ms. Swink's counsel in the probate proceedings by admitting his conduct and authorizing counsel to disclose the grievances filed with the disciplinary authorities. He testified that, although no one from the West estate ever asked him to reimburse the fee he charged, he noticed, while preparing for this hearing, that the successor personal representative of the West estate had listed Mr. Coppola's fee as an asset of the estate. Mr. Coppola promptly wrote to the personal representative and offered to reimburse the fee. Mr. Coppola also testified that he was willing to consider other forms of restitution, including reimbursement of legal fees incurred in the probate proceedings.

Mr. Coppola has incurred penalties beyond what is at issue in these proceedings. He is also subject to disciplinary proceedings in Virginia and has had to retain counsel in two jurisdictions. During the pendency of these proceedings, he has limited his practice out of concern that he will not be able to follow through in his representation of new clients. His practice limitations have reduced his income to levels that barely cover his significant family expenses.

Mr. Coppola has made efforts at rehabilitation to ensure that the conduct at issue does not recur. As noted, he

consulted with a psychologist and examined the personality traits, including his aversion to confrontation, that might have contributed to his conduct. He altered his office practices to use outside notaries for all document certifications. He disclosed his conduct to his partner and his family and consulted them for advise. The Court finds that the conduct at issue in this proceeding is unlikely to recur.

The hearing judge concluded:

### IV. CONCLUSIONS OF LAW AS TO MITIGATION.

Mitigating factors are always considered by the Court in deciding a disposition in an Attorney Grievance case. In *Attorney Grievance v. Marcalus*, 414 Md. 501, 996 A.2d 350 (2010), the Court said:

> Determining a sanction against Marcalus, however, also requires weighing aggravating and mitigating factors in order to give context to his actions. In past disciplinary cases, we have considered a non-exclusive list of several possible aggravating and mitigating factors, also derived from the ABA Manual. *See, e.g., Attorney Grievance Comm'n v. Glenn*, 341 Md. 448, 488–89, 671 A.2d 463, 483 (1996). These include the presence or absence of a prior disciplinary record; the absence of a dishonest or selfish motive; timely good faith efforts to make restitution or rectify consequences of misconduct; full and free disclosure to the disciplinary board or a cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental impairment; any delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and remoteness of prior offenses, if they exist. *See id. See generally* 2 ABA Manual, supra, at 101:3102–101:3105 (discussing the application of potential aggravating and mitigating factors). *Marcalus*, 414 Md. at 524, 996 A.2d at 363.

Even though matters raised by a Respondent do not constitute defenses to the ethical violation, they may be considered as mitigating factors. *Attorney Grievance v. Ruddy,*

411 Md. 30, 78, 981 A.2d 637, 665 (2009). Only the mitigating factors that existed at the time of the unethical or criminal behavior, and not subsequent conduct, are considered. *Attorney Grievance v. Garcia,* 410 Md. 507, 534, 979 A.2d 146, 162 (2009).

In some cases, even though the attorney's conduct constitutes dishonesty, deceit, or a crime that normally would result in disbarment, the mitigating factors may be considered to reduce the penalty. *See Attorney Grievance v. Floyd,* 400 Md. 236, 254, 929 A.2d 61, 71 (2007) (omitted information in letter to the Federal Trade Commission conduct involving dishonesty, fraud, deceit, or misrepresentation resulted in only a 90–day suspension due to mitigating factors); *Attorney Grievance v. Lawson,* 401 Md. 536, 576–77, 933 A.2d 842, 866 (2007) (mitigating circumstances included relative youth and inexperience and his lack of remorse and apprehension of the wrongness of his actions resulted in indefinite suspension); *Attorney Grievance v. Harrington,* 367 Md. 36, 48, 51, 785 A.2d 1260, 1267, 1269 (2001) (indefinite suspension for intentionally dishonest conduct based on mitigating factors). The Court always looks at the nature of the misconduct and the lawyer's motives, applies the ABA Standards and the mitigating factors. *Attorney Grievance v. Sweitzer,* 395 Md. 586, 911 A.2d 440 (2006) (Court considered factors including ethical duty violated and the lawyer's state of mind and did not impose the sanction of disbarment). *See Attorney Grievance v. Garcia,* 410 Md. 507, 535–37, 979 A.2d 146 (2009).

In light of the mitigating factors, the Court finds by a preponderance of the evidence that Mr. Coppola did engage in conduct that was dishonest, deceitful or criminal, but that the degree of his actions was relatively limited—i.e., falsely executed deed, Will and trust documents aimed at a purpose of distributing assets in an efficient way that would save the Estate and heirs legal fees in an amount of up to an estimated $10,000. There are strong mitigating factors consistent with the Court of Appeals cases that must be balanced against Respondent's misconduct. The court finds

by a preponderance of the evidence that the mitigating factors for Mr. Coppola are consistent with the decisions that justify a lesser penalty than disbarment.[7]

## Standard of Review

 This Court has original and complete jurisdiction in attorney discipline proceedings and conducts an independent review of the record. *Attorney Grievance v. Bleecker*, 414 Md. 147, 167, 994 A.2d 928, 940 (2010); *Attorney Grievance v. Jarosinski*, 411 Md. 432, 448, 983 A.2d 477, 487 (2009) (quotations omitted); *Attorney Grievance v. Foltz*, 411 Md. 359, 396, 983 A.2d 434, 456 (2009) (quotations omitted); *Attorney Grievance v. Gisriel*, 409 Md. 331, 364, 974 A.2d 331, 350 (2009). We review the hearing judge's conclusions of law de novo. Rule 16–759(b)(1);[8] *Bleecker*, 414 Md. at 167, 994 A.2d at 940; *Jarosinski*, 411 Md. at 448–49, 983 A.2d at 487; *Foltz*, 411 Md. at 396, 983 A.2d at 456; *Gisriel*, 409 Md. at 365, 974 A.2d at 351. In our review of the record, the hearing judge's findings of fact will not be disturbed unless clearly erroneous. Rule 16–759(b)(2);[9] *Bleecker*, 414 Md. at 167, 994 A.2d at 940; *Jarosinski*, 411 Md. at 448, 983 A.2d at 487; *Foltz*, 411 Md. at 396–97, 983 A.2d at 456; *Gisriel*, 409 Md. at 365, 974 A.2d at 351.

---

7. Notwithstanding the hearing judge's opinion bearing on the sanction analysis, we note that, under Rule 16–759(c), the determination as to the appropriate sanction is within the sole discretion of this Court.

8. Rule 16–759(b)(1) provides:
 **Review by Court of Appeals.** (1) Conclusions of law. The Court of Appeals shall review de novo the circuit court judge's conclusions of law.

9. Rule 16–759(b)(2) provides:
 (2) Findings of fact. (A) If no exceptions are filed. If no exceptions are filed, the Court may treat the findings of fact as established for the purpose of determining appropriate sanctions, if any.
 (B) If exceptions are filed. If exceptions are filed, the Court of Appeals shall determine whether the findings of fact have been proven by the requisite standard of proof set out in Rule 16–757(b). The Court may confine its review to the findings of fact challenged by the exceptions. The Court shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses.

## Sanction

Neither party has filed exceptions challenging the hearing judge's findings of fact pertaining to Coppola's alleged violations of Rules 1.2(d) and 8.4(a), (b), (c), and (d). We, therefore, "treat the findings ... as established for the purpose of determining appropriate sanctions...." Md. Rule 16–759(b).

Coppola, moreover, does not except to any of Judge Jarashow's conclusions of law, observing that his case "was always about the context of his admitted misconduct and factors supporting mitigation, and the trial court's mitigation findings are critical to the application of this Court's precedents on sanction." We agree with the hearing judge's conclusions of law and find that they are supported by clear and convincing evidence.

We are, thus, only left with the task of determining the appropriate sanction in the present case for Coppola's violations of Rules 1.2(d) and 8.4(a), (b), (c), and (d). Bar Counsel does take exception to two of the hearing judge's findings regarding aggravation and recommends disbarment. Coppola suggests a public reprimand or a suspension of thirty days.

In determining an appropriate sanction, we evaluate an attorney grievance matter on its own merits, taking into account the facts and circumstances involved. *Attorney Grievance v. Bleecker,* 414 Md. 147, 176, 994 A.2d 928, 945 (2010). The goal of attorney discipline is protection of the public, rather than punishment of the erring attorney. *Attorney Grievance v. Goff,* 399 Md. 1, 30, 922 A.2d 554, 571 (2007), citing *Attorney Grievance v. Mba–Jonas,* 397 Md. 690, 702, 919 A.2d 669, 677 (2007); *Attorney Grievance v. Rees,* 396 Md. 248, 254, 913 A.2d 68, 72 (2006); *Attorney Grievance v. Kreamer,* 387 Md. 503, 533–34, 876 A.2d 79, 97 (2005). Imposing sanctions that are commensurate with the nature and gravity of the violations and the intent with which they were committed is consistent with, and in fact furthers, the purpose of protection of the public, *Goff,* 399 Md. at 30–31, 922 A.2d at 571; *Attorney Grievance v. Stein,* 373 Md. 531, 537, 819 A.2d 372, 375 (2003), in that such sanctions protect the integrity of

the legal profession, *Attorney Grievance v. Cassidy*, 362 Md. 689, 698, 766 A.2d 632, 637 (2001), as well as advance the public's confidence in the legal profession. *Attorney Grievance v. Christopher*, 383 Md. 624, 639, 861 A.2d 692, 701 (2004); *Stein*, 373 Md. at 537, 819 A.2d at 375; *Powell*, 369 Md. at 474, 800 A.2d at 789. We must, therefore, consider the nature of the ethical duties violated in light of any aggravating or mitigating circumstances. *Bleecker*, 414 Md. at 176, 994 A.2d at 945; *Attorney Grievance v. Harris*, 403 Md. 142, 166–67, 939 A.2d 732, 746–47 (2008).

With regard to aggravating factors, we often consult Standard 9.22 of the American Bar Association Standards for Imposing Lawyer Sanctions:

(a) prior disciplinary offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(g) refusal to acknowledge wrongful nature of conduct;

(h) vulnerability of victim;

(i) substantial experience in the practice of law;

(j) indifference to making restitution.

*Bleecker*, 414 Md. at 176–77, 994 A.2d at 945–46, quoting *Harris*, 403 Md. at 167–68, 939 A.2d at 747. Bar Counsel excepts to the fact that the hearing judge did not make the requisite findings regarding (c), a pattern of misconduct,[10] and (i), substantial experience in the practice of law.

---

**10.** Despite Coppola's contention that Bar Counsel had waived any exception to the hearing judge's failure to find that Coppola engaged in a pattern of misconduct, we note that, in its Proposed Findings of Fact and Conclusions of Law, Bar Counsel clearly proposed that Coppola was involved in a pattern of misconduct:

■ We sustain Bar Counsel's exception to the failure of the hearing judge to find as an aggravator that Coppola engaged in a pattern of misconduct. Coppola did, indeed, engage in a pattern of misconduct, to include: (1) empowering Ms. Swink to forge Ms. West's signature on the estate plan documents, (2) notarizing the falsely executed and initialed Will, (3) notarizing the falsely executed Trust Declaration and Schedule, (4) notarizing the falsely executed Power of Attorney naming Ms. Swink as Ms. West's attorney-in-fact, (5) notarizing the falsely executed Deed transferring the property from Ms. West to the Elizabeth L. West Living Trust, (6) directing his employees to falsely attest as Ms. West's witnesses despite the fact that Ms. West was not present and despite the fact that her signature was not on the Will, (7) notarizing the Will that included a false recital that stated, in effect, that Ms. West and the witnesses, Coppola's employees, appeared in each other's presence and in Coppola's presence and that Ms. West declared that instrument was her Last Will and Testament, that it was willingly executed in the presence of the witnesses, that the witnesses stated that they, in the presence of Ms. West, and at her request, subscribed their names as witnesses, (8) directing the witnesses to falsely swear to their attestation and notarizing the attestations with knowledge that those oaths were false, and (9) directing his employee to record the fraudulent Deed in the Prince George's County land records. This series of acts clearly formed a pattern of misconduct, albeit with one goal in mind. One goal, though, does not obviate that Coppola engaged in a series of acts over a number of days.

■ We also sustain Bar Counsel's exception regarding the hearing judge's failure to find Coppola's experience in the practice of law as an aggravator. Coppola was admitted to

Beyond the notarizations, however, was his acquiescence in and, indeed, promotion of a scheme to avoid probate through the use of falsely executed documents. Ms. West's children sought to achieve probate savings the Respondent told them were possible if all were agreed to the course of action that they then pursued. He was the catalyst for their abuse of the law....

the Virginia Bar in 1989 and the Maryland Bar in 1997 and has been practicing extensively in the area of estates and trusts law since 1996, representing "950 to 1,000 clients over the course of his practice." Coppola's experience in the practice of law, especially in the area which is the subject matter of this case, is definitely an aggravator. *See Attorney Grievance v. Whitehead,* 405 Md. 240, 263, 950 A.2d 798, 812 (2008) ("Respondent also had substantial experience in the practice of law having been admitted to the Bar of the Court of Appeals of Maryland on December 1, 1973, the Bar of the District of Columbia in 1991, and the Bar of the State of New York in 1997."); *Attorney Grievance v. Mininsohn,* 380 Md. 536, 576, 846 A.2d 353, 376 (2004) ("With almost twenty-five years experience at the bar, Mininsohn also has 'substantial experience in the practice of law.' "); *Attorney Grievance v. Garfield,* 369 Md. 85, 106, 797 A.2d 757, 769 (2002) (recognizing attorney's "substantial experience in the practice of law" as an aggravating factor); *Attorney Grievance v. Harris,* 371 Md. 510, 556, 810 A.2d 457, 485 (2002) (citing attorney's substantial experience in the practice of law as an aggravating factor).

 In making our determination regarding the appropriate sanction, we also consider mitigating factors, some of which may include:

"absence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses."

*Attorney Grievance v. Gordon,* 413 Md. 46, 63, 991 A.2d 51, 61 (2010), quoting *Attorney Grievance v. Sweitzer,* 395 Md. 586, 599, 911 A.2d 440, 448 (2006). The hearing judge determined

that various mitigating factors were present in this case, including Coppola's lack of a prior disciplinary record, the absence of a selfish motive in his conduct, that he cooperated with Bar Counsel to "an exceptional degree," that he had "genuine remorse for his conduct" and that he offered to file a deed of correction and has repaid the legal fee charged to Ms. West's estate.

With respect to the value of these mitigators, we note that, in *Attorney Grievance v. Vanderlinde*, 364 Md. 376, 397, 773 A.2d 463, 475 (2001), we determined that, in the absence of *compelling extenuating circumstances*, "present and associated with the illegal or improper acts at the time committed," disbarment is the appropriate sanction for violations of Rule 8.4(c), in which intentionally dishonest conduct is present:

> Upon reflection as a Court, in disciplinary matters, we will not in the future attempt to distinguish between degrees of intentional dishonesty based upon convictions, testimonials or other factors. Unlike matters relating to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in an attorney's character.
>
> Disbarment ordinarily should be the sanction for intentional dishonest conduct.

*Id.* at 418, 773 A.2d at 488.

The *Vanderlinde* principles are applicable in the present case, because Coppola intentionally acted dishonestly. The *Vanderlinde* precepts regarding extenuation, however, do not apply:

> [W]e will not accept, as "compelling extenuating circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the "root cause" of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and

with the MRPC. Only if the circumstances are that compelling, will we even consider imposing less than the most severe sanction of disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct, whether occurring in the practice of law, or otherwise.

*Id.* at 413–14, 773 A.2d at 485. Since *Vanderlinde,* we have only found compelling extenuating circumstances in cases where there was clear evidence that the attorney's mental condition was so debilitating that, in addition to being the "root cause" of the misconduct, it also affected his or her ability to function in normal daily activities. *See Attorney Grievance v. Christopher,* 383 Md. 624, 646, 861 A.2d 692, 705 (2004) (determining that extenuating circumstances were present when mental condition and impairment arising from alcoholism and severe depression affected respondent's ability to function in his normal day-to-day activities and testimony from doctor indicating that attorney's "mental conditions were the root cause of his misconduct"). In other cases, however, where there was either no evidence presented as to a mental condition during the misconduct in issue or where evidence of a mental condition was insufficient, we have declined to find compelling extenuating circumstances. *See Attorney Grievance v. Palmer,* 417 Md. 185, 212–13, 9 A.3d 37, 53 (2010) (reasoning that, "any alleged psychological issues Respondent was dealing with contemporaneously with his misconduct do not rise to a level sufficient to meet *Vanderlinde's* requirements, and therefore, without more, do not mitigate the sanction here to less than disbarment"); *Attorney Grievance v. Guida,* 391 Md. 33, 62, 891 A.2d 1085, 1102 (2006) (determining that, "while Respondent suffered from a severe major depression at the relevant times, his depression (and related sequelae) was not so great that it satisfied the *Vanderlinde* threshold for mitigation of the sanction for his violations of the MRPC"); *Attorney Grievance v. Jordan,* 386 Md. 583, 873 A.2d 1161 (2005) (no compelling extenuating circumstances where respondent neither presented sufficient evidence of such extenuating circumstances, nor did she present any

supporting testimony from medical professionals, and medical condition and treatment occurred subsequent to her fraudulent behavior); *Attorney Grievance v. Goodman,* 381 Md. 480, 496, 850 A.2d 1157, 1167 (2004) (finding, despite respondent's claims that physical problems, emotional problems, or any other host of problems he noted, caused or mitigated his behavior in this case, that "the record in this case does not demand or even support a finding that 'the most serious and utterly debilitating mental or physical health conditions' caused Respondent's inability to conform his conduct in accordance with the law and with the rules."). In the present case, the hearing judge found that, "[d]espite the emotional character of the situation, the Respondent suffered no cognitive deficits and knew what he was doing and that it was wrong."

 Coppola, nonetheless, urges us to impose a sanction less than disbarment by pointing us to various post-*Vanderlinde* cases in which penalties less severe than disbarment were imposed. In addition to the fact that "[w]e repeatedly have recognized that each attorney grievance case rests on its own merits," *Attorney Grievance v. Garcia,* 410 Md. 507, 529, 979 A.2d 146, 159 (2009), the cases cited by Coppola are not persuasive in our determination of the appropriate sanction in the present case. In many of the cases cited by Coppola, *Vanderlinde* was not applied. *See Attorney Grievance v. Gordon,* 413 Md. 46, 991 A.2d 51 (2010); *Attorney Grievance v. Robaton,* 411 Md. 415, 983 A.2d 467 (2009); *Attorney Grievance v. Elmendorf,* 404 Md. 353, 946 A.2d 542 (2008); *Attorney Grievance v. Kalil,* 402 Md. 358, 936 A.2d 854 (2007); *Attorney Grievance v. Hermina,* 379 Md. 503, 842 A.2d 762 (2004); *see also Attorney Grievance v. Tanko,* 408 Md. 404, 969 A.2d 1010 (2009); *Attorney Grievance v. Floyd,* 400 Md. 236, 929 A.2d 61 (2007); *Attorney Grievance v. Reinhardt,* 391 Md. 209, 892 A.2d 533 (2006); *Attorney Grievance v. Potter,* 380 Md. 128, 844 A.2d 367 (2004).

 Coppola asserts that he only was attempting to facilitate his clients' wishes and respond to a truly sorrowful situation and that he did not benefit from his acts. We have

already addressed these contentions in *Garcia*, when we said, "[v]iolations of Rule 8.4 are not justified by reference to the ends when illegal methods are utilized, nor by whether the attorney profited from the illicit behavior." 410 Md. at 522, 979 A.2d at 155. There can be no doubt that lawyers deal with situations and circumstances that are tragic, as well as emotionally intense and vexing for clients, as happiness only may be found with a client who adopts a child.

Attorneys, however, are not and cannot be hired guns for individuals who seek to subvert the administration of justice. Rather, the great strength of our profession lies in the integrity with which we act and the honor that we bring to our work. Attorneys are not permitted to discard their ethical obligations when it becomes difficult or stressful to maintain them.

To conclude, the dictates of *Vanderlinde* are applicable in the present case and, accordingly, we order disbarment.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JOHN MICHAEL COPPOLA.**

BELL, C.J., and MURPHY, J., Dissent.

MURPHY, J., dissenting in which BELL, C.J., joins.

If I were persuaded that the Respondent had engaged in a "pattern of misconduct" within the meaning of ABA Standard 9.22(c), I would not dissent from the decision to disbar. I am persuaded, however, that this Court should overrule Bar Counsel's exception to the hearing judge's "failure" to find that the Respondent engaged in a "pattern of misconduct," as that term has been interpreted by the Supreme Court of Oregon in *In re Redden*, 342 Or. 393, 153 P.3d 113, 114–15 (2007), and by the Supreme Court of Arizona in *In re Levine*,

174 Ariz. 146, 847 P.2d 1093, 1118–19 (1993). Because a series of acts undertaken to accomplish a particular result in a single case does not constitute a pattern of misconduct, I dissent from the majority's decision to sustain Bar Counsel's "pattern of misconduct" exception.

Although the Respondent "engaged in a series of acts over a number of days," those acts were engaged in for the sole purpose of carrying out Ms. West's intent. The record shows that the Respondent (1) had never before engaged in the same or similar wrongdoing, and (2) has never engaged in any misconduct when representing other clients. Under these unique circumstances, the public is protected by the imposition of an indefinite suspension, with the right to petition for readmission no sooner than two years after the date on which the suspension takes effect. I therefore dissent from the decision to disbar the Respondent.

Chief Judge BELL has authorized me to state that he joins this dissenting opinion.